**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bao Thien GIANG, Defendant–Appellant.**

No. 97–2508.

United States Court of Appeals,
Seventh Circuit.

Argued March 3, 1998.

Decided May 8, 1998.

Christian R. Larsen (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

David R. Pruhs (argued), Milwaukee, WI, for Defendant–Appellant.

Before ESCHBACH, COFFEY, and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Bao Thien Giang, a resident alien from Vietnam, took part in a money scam that

used a Hong Kong twist. As uncertainty swirled around the former British colony in the months preceding its return to China on July 1, 1997, Giang and two cohorts devised a fraud scheme based upon a story they concocted about needing to transfer money out of Hong Kong before the handover. They would offer an unsuspecting individual a sum of money for accepting funds that they claimed would be wired from Hong Kong to his personal bank account. In fact, no funds would be transferred. The collaborators would then deposit fraudulent checks into that individual's personal account, assure him that the transfer had been made, withdraw the individual's money, and abscond. Giang was eventually convicted and sentenced to 21 months' imprisonment. On appeal, he argues that the district court overstated the amount of loss attributable to him for his role in the scheme. See U.S.S.G. § 2F1.1(b)(1). We affirm.

## I

Three Milwaukee, Wisconsin area residents were victimized by this scheme during the last week of April 1996. Jerry Lee Lor informed law enforcement officers that he had been approached at a restaurant in Milwaukee by three Asian males who asked for his help in getting their money out of Hong Kong. For a 15 percent cut of the money, Lor agreed to participate, and gave the three men information about his bank accounts in Milwaukee. The three men in turn deposited fraudulent cashier's checks totaling more than $46,000 into Lor's accounts at five banks. A couple days later, the three men drove Lor to four of the banks, and Lor withdrew $32,800 from his accounts.

A second Milwaukee resident was victimized in a similar fashion. Carl Ramirez reported that an Asian male who called himself "Scott Dunham" approached him with the same kind of a pitch. Ramirez agreed to provide Dunham with his bank account information. Two days later, Dunham deposited a $9,600 counterfeit cashier's check into Ramirez's account pursuant to instructions. Ramirez subsequently withdrew $9,600 from his account and gave it to Dunham, who returned $500 to Ramirez for his assistance.

The third victim was Todd Baldwin. He told law enforcement officers of a like en-counter with an Asian male who identified himself as "Scott Dunham." Like Lor and Ramirez, Baldwin provided Dunham with information about his bank account. Dunham deposited a counterfeit check in the amount of $4,500 in Baldwin's account at the University of Wisconsin Credit Union. Baldwin thereafter withdrew $4,500 and gave it to Dunham.

About a month later, Lor identified Giang from a Secret Service photo spread of 18 men. Ramirez and Baldwin were unable to identify Giang in an array of the same suspects. Ramirez in fact said that he was 70 percent certain that the person known to him as Dunham was an individual other than Giang. But Ramirez was able to identify a license plate number on a vehicle used by Dunham. That plate number, "HPV 338," was traced upon investigation to Budget Car Rental at the Milwaukee County airport. Budget records reflected that the car had been rented on April 29, 1996, by "BT Giang" of Canoga Park, California, and American Express records confirmed that Giang had rented the car. Giang returned the rental car to Budget at O'Hare Airport in Chicago on May 1, 1996.

Thereafter Giang was arrested in Los Angeles in late October 1996. He was charged with and pleaded guilty to conspiring to commit bank fraud, 18 U.S.C. § 371; bank fraud, 18 U.S.C. §§ 1344 & 2; and transporting fraudulently obtained funds in interstate commerce, 18 U.S.C. §§ 2314 & 2.

At sentencing, Giang objected to the amount of "loss" under U.S.S.G. § 2F1.1(b)(1) that could be attributed to his role in the scheme. He contended that he should be held responsible for only $32,800, the amount of the Lor fraud, but nothing more because he played no role in victimizing either Ramirez or Baldwin. The district court disagreed, and found Giang accountable for the entire $43,000 loss resulting from the three scams. Based on this finding, the court increased Giang's base offense level by five and sentenced him to the maximum of 21 months' imprisonment.

## II

On appeal, Giang argues that the district court overstated the amount of loss properly attributable to him when it held him responsible for losses totaling $43,000. Section 2F1.1(b)(1) of the Sentencing Guidelines provides that if the crime involved a loss more than $40,000, the defendant's base offense level should be enhanced by five levels. Giang denies any role in the fraud perpetrated on Ramirez, and insists that the court should have increased his offense level by only four for his participation in the Lor scam that netted $32,800.[1]

While we review the district court's calculation of loss for clear error, see *United States v. Brown*, 136 F.3d 1176, 1183 (7th Cir.1998), we agree with the district court's assessment that the loss attributable to Giang for his role in the fraudulent scheme amounted to $43,000. Where there is a "jointly undertaken criminal activity," § 1B1.3(a)(1)(B) directs the court, as in all conspiracies, to consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See United States v. Boatner*, 99 F.3d 831, 835 (7th Cir.1996). As the district court pointed out, Giang had traveled from California to Milwaukee with two others for the purpose of carrying out a fraudulent scheme; he directly participated in the Lor scam, which employed the same check-passing tactics that were used against Ramirez and Baldwin; and he rented in his own name the Budget car used in the Ramirez transaction. We agree with the trial court's finding that it is "almost unbelievable" that Giang could travel all the way to Milwaukee and not know the "mission" of his two counterparts. Moreover, even though Giang himself may have only directly participated in the Lor transaction, as he contends, the relevant loss for purposes of § 2F1.1(b) is not limited solely to the defendant's personal gain. In light of § 2F1.1(b)'s emphasis on the victim's loss rather than the defendant's profit, see comment. n. 8, it is proper to hold Giang responsible for loss that he helped bring about in some way, even if he did not share in all the proceeds.

Giang urges us to base our decision on *United States v. Studley*, 47 F.3d 569 (2d Cir.1995), in which the Second Circuit held that the defendant in a telemarketing scheme was not accountable for all of the losses resulting from the other employees' fraudulent acts. In that case, Studley, a telemarketing salesman, pleaded guilty to inducing a customer to pay an application fee for a loan that the customer would never receive. Studley was one of a dozen or so sales representatives who solicited applications. Even though Studley personally defrauded victims of only $5,000 to $10,000, the trial court attributed to him the entire loss caused by the telemarketing operation during his employment, approximately $120,000. The Second Circuit vacated Studley's sentence on the grounds that there was insufficient evidence to establish that he had agreed to participate in the fraudulent activities of the other sales representatives. Studley neither designed nor developed the telemarketing scheme. Nor did he promote the scheme beyond his own sales efforts. He was paid purely on a commission basis, receiving no share of the profits, and he did not assist any of the other representatives with their sales. *Id.* at 576.

Giang's reliance on *Studley* is misplaced. The government's evidence makes clear that Giang participated in the fraud scheme actively and more so than Studley. Giang traveled with others from California to Wisconsin specifically to participate in their money scam; he was active in one of three nearly identical fraudulent check victimizations; and he rented the car that facilitated another of the fraudulent transactions. In fact, Giang also returned the rental car to O'Hare Airport *after* the Ramirez scam had taken place.

In two other decisions of this court post–*Studley*, we have held that a sentencing court may find a joint undertaking without proof of all the factors set out in *Studley*. In *United States v. Boatner*, 99 F.3d 831, 835–36 (7th Cir.1996), Boatner and her three co-conspirators jointly executed a staged automobile accident scheme that defrauded an insurance company of $22,000. Pretending to have been victims of a hit-and-run accident, the

---

1. Had Giang been assessed a four—rather than five—level increase, his guideline range would have been 12 to 18 months instead of the 15 to 21 months relied upon by the district court.

conspirators acted collectively: they piled into the previously-damaged car together; they faked individual injuries; they gave police the same fictitious account about being struck by a hit-and-run driver; they went to the same hospital together; and they hired the same lawyer to submit false accident and injury claims to the insurance company. Boatner eventually pleaded guilty to mail fraud, and at sentencing was held accountable for the entire loss suffered by the insurer, rather than only the $4,600 that she received from the insurer in her settlement. On appeal, Boatner, like Giang, tried to analogize her situation to *Studley.* Unlike *Studley,* however, "abundan[t]" evidence in *Boatner* established that the conspirators acted jointly in carrying out the fraudulent accident scheme:

> Whereas in *Studley* each telemarketer pursued different victims independently, here, the various [participants who were involved in the staged automobile accident] worked together to defraud one victim. They concocted a common story; they feigned injuries together; they lied to the police together; and they retained the same attorney to pursue a fraudulent claim against a single victim, Travelers [Insurance Company].

*Id.* at 836, 837. Similarly, in *United States v. Senn,* 129 F.3d 886 (7th Cir.1997), also involving a telemarketing scam, we held the principal telemarketer responsible for the entire amount of the loss, rather than the amount of which he personally defrauded his victims. We noted that the telemarketer in *Senn* was "far more deeply involved than Studley" because he bilked his customers out of $282,000, or more than three-quarters of the total take; he developed the most successful scam; other members of the scam used his pitch; and he knew from the outset that the scam operation had other participants. *Id.* at 898. As in *Boatner* and *Senn,* Giang's close collaboration with his cohorts established that the Hong Kong money scam was a joint undertaking. The district court thus did not commit clear error in concluding that Giang and his collaborators acted together "part and parcel of the overall scheme."

Conclusion

Giang is accountable for losses reasonably foreseeable by him, and he should have reasonably foreseen that the amount of the loss from the fraud scheme was in excess of $40,000. We are convinced that the district court's findings in dealing with the proof of loss pursuant to § 2F1.1 were not clearly erroneous. The decision of the district court is AFFIRMED.