In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1104

United States of America,

Plaintiff-Appellee,

v.

Scott Thomas,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. CR 98-20031--Michael P. McCuskey, Judge.

Argued September 16, 1999--Decided December 16, 1999

Before Ripple, Manion, and Diane P. Wood, Circuit
Judges.

Diane P. Wood, Circuit Judge.  For over two years,
Scott Thomas played a part in a telemarketing
fraud scheme centered in Atlanta, Georgia, under
which elderly victims were persuaded to send
advance "tax" payments on fictional cash prizes
they had won. Of course, there were no prizes,
and the supposed tax payments went into the
pockets of the crooks. After he was caught,
Thomas pleaded guilty to three counts of wire
fraud, in violation of 18 U.S.C. sec. 1343, and
received a sentence of 21 months' imprisonment.
His appeal raises only one question: whether the
district court erred when it found that the
"jointly undertaken criminal activity" (as the
term is used in U.S. Sentencing Guideline sec.
1B1.3(a)(1)(B)) in which Thomas participated was
the whole scam. Thomas argues that he should be
held accountable only for the wire transfers in
which he was actually involved. We conclude that
the district court's decision was not in error,
and we therefore affirm.

I

The telemarketing scheme itself was the
brainchild of George Coe, David Beasley, and
Jeffrey Thomas (Scott's brother), all of whom
operated out of Atlanta. One of those three would

call an elderly individual at home and inform her that she had won a cash prize. The only catch was that the lucky winner would have to pay taxes on the prize money before she could receive it. The caller would then instruct the victim to wire the tax payment to an identified individual.

In order to protect themselves, Coe, Beasley, and Jeffrey Thomas did not require the victims to wire the money directly to them. Instead, they used "runners" located in the Danville-Champaign, Illinois, area. Thomas was one of those runners, along with a number of other people; all of them were old friends of Coe and Beasley. Because Western Union requires photo identification before it will release wired funds to a recipient, the runners had to use their real names for the system to work. So, for example, a victim would wire funds addressed to Thomas; he would collect the money at Western Union; he would then retain a share (usually 10 percent); and then, using an alias, he would wire the balance to Coe, Beasley, or Jeffrey Thomas. Normally the runners worked independently, but from time to time Thomas accompanied another runner, Aaron Williams, on his pick-ups.

Thomas began his work as a runner in September 1995. While he was in custody in Danville, Illinois, on an unrelated charge, he acknowledged that he had known Coe all his life and that he had picked up one wire transfer for Coe. For some reason, however, that was not enough to alert authorities to the full operation. Not until 1997 did a serious investigation begin. Early in that year, an official of the U.S. Postal Inspection Service met with Thomas and interviewed him. Thomas acknowledged that his role was to pick up money wired by Coe or Beasley. In March 1997, the postal inspector informed Thomas that the scheme targeted elderly victims. Undeterred and unstopped, Thomas continued to play his part in the enterprise after that meeting.

In May 1998, Thomas and four others were (at last) indicted and charged with 24 counts of wire fraud. Thomas pleaded guilty to three counts, and the government agreed to dismiss the others at sentencing. The pre-sentence report (PSR) calculated the total losses under the scheme to be $32,885. Of that amount, Thomas personally picked up $12,700 in wire transfers. Thomas raised three objections to the PSR: first, he argued that he should not be held accountable for his co-defendants' posing as agents of the Internal Revenue Service; second, he objected to the conclusion that there were no factors warranting a downward departure; and third, he objected to the recommendation that he should be accountable for the entire loss. The district

court sustained the first objection, finding that Thomas did not know about the IRS angle used in the telemarketing portion of the transaction (apart from his realization that something was "fishy"). It overruled the second, finding that a downward departure was unwarranted because he had ten criminal history points (including a felony drug offense). Last, the court rejected the third objection, with the following comment:

One, the Court based on the evidence finds that Mr. Scott Thomas is an admitted runner in this scheme and, two, that he accompanied Mr. Aaron Williams to various events of which Mr. Williams was a runner; that all of the individuals in this transaction know each other, are friends, and, therefore, Mr. Thomas is accountable for the entire scheme from the date that he first entered participation which was . . . September 27, 1995.

The $32,885 figure gave Thomas an adjusted offense level of 10 under U.S.S.G. sec. 2F1.1(b)(1)(E). Along with his criminal history category IV, his sentencing range was 15 to 21 months. The district court sentenced him to 21 months, the top of that range.

II

   On appeal, Thomas urges us to find that the district court erroneously conflated two separate requirements of the relevant conduct guideline, sec. 1B1.3, when it found him responsible for the full amount of the scheme. The relevant language of the guideline is as follows:

[The base offense level must be determined on the basis of,] in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]

Thomas rightly notes that this section first requires the sentencing court to determine what was the jointly undertaken criminal activity, and then, with respect to that activity, to decide what acts or omissions were reasonably foreseeable to the defendant. Application Note 2 makes this even more clear, when it states:

In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:

(i)  in furtherance of the jointly undertaken

criminal activity; and

(ii)  reasonably foreseeable in connection with that criminal activity.

Relying heavily on the Second Circuit's decision in United States v. Studley, 47 F.3d 569 (2d Cir. 1995), Thomas argues that the court here looked only at the second of those two factors--reasonable foreseeability--and failed to recognize that his jointly undertaken criminal activity was limited to his role as a runner in the transactions he actually handled.

In Studley, the defendant participated as a caller in a fraudulent telemarketing scheme. He and several others, working a phone bank, called people and asked if they wanted to apply for a loan. After fraudulently telling the target that he had been "preapproved," Studley and his colleagues would instruct him to send in a $249 loan processing fee. Like the prizes in our case, the loans were fictional. The question before the Second Circuit was whether Studley should be accountable for all losses inflicted by the scheme, or for only the losses Studley caused directly. The court used a two-step analysis to resolve the case: it asked first which acts were within the scope of Studley's agreement, and second, whether those acts were reasonably foreseeable to him. It found a number of factors to be relevant to the first question: Were profits and resources pooled? Was there a joint design and execution? What precise role did the defendant agree to play? Even if the defendant was perfectly aware of the breadth of the scheme, if he was not part of all of it, his sentence could not be based on more than the part to which he had agreed.

Thomas is not the first defendant to argue to this court that the Studley analysis was applicable to his case. In each of three other cases, the same point was presented, and in each of them, we have distinguished Studley. See United States v. Giang, 143 F.3d 1078, 1080-81 (7th Cir. 1998) (distinguishing Studley because the defendant was active in one of three nearly identical fraudulent transactions and facilitated a second one); United States v. Senn, 129 F.3d 886, 898 (7th Cir. 1997) (distinguishing Studley because the defendant was responsible for 78 percent of the scheme's take, developed the most successful "rap" and scam, and knew from the beginning that the operation had other participants); United States v. Boatner, 99 F.3d 831, 837 (7th Cir. 1996) (distinguishing Studley because co-conspirators worked together to defraud one victim, including concocting the same story, lying to police, and hiring the same

lawyer to pursue their fraudulent claims).

In none of those cases did we assume that the requirements for conduct in furtherance of a jointly undertaken criminal activity and for reasonable foreseeability were one and the same. Nor do we do so here. To that extent, we have no quarrel with the Second Circuit's Studley decision, which rightly acknowledges the two separate inquiries that must be undertaken to determine relevant conduct under U.S.S.G. sec. 1B1.3. Studley also rightly recognizes that the first question, which goes to the scope of the defendant's agreement, is one of fact, and that the answer will depend on the particular circumstances of the case. On the other hand, we do not read Studley as holding that the defendant's knowledge about the broader scheme is utterly beside the point in ascertaining the "jointly undertaken criminal activity" in which the defendant has agreed to participate. Knowledge is pertinent to both parts of the sec. 1B1.3 inquiry, even if it is not sufficient standing alone to prove the scope of an agreement.

Here, Thomas argues that the evidence compelled a conclusion that his jointly undertaken criminal activity was limited to the narrower set of transactions for which he served as a runner. He notes that his compensation was in no way related to the broader scheme, because it was just a cut of the particular wire transfer he collected. He admits to knowing that other runners were also involved, but their activities were independent of his. Without more conscious or specific coordination with the others, Thomas argues, the evidence cannot support a finding that he agreed to join the scheme as a whole.

We review district court determinations of relevant conduct for clear error, United States v. Townsend, 73 F.3d 747, 751 (7th Cir. 1996), as long as the court has used the proper legal framework. Here, while our task of reviewing Thomas's sentence would have been easier if the district court had explained itself more fully, we are satisfied that it committed no legal errors in interpreting sec. 1B1.3. Its comment and its reliance on the PSR indicate that it was aware that more than simple foreseeability was required before Thomas could be held responsible for the full amount of money collected from the victims. That leaves only the court's factual determination, which was that the "jointly undertaken criminal activity" in which Thomas participated was the scheme as a whole, not just his specific part. On this question, the evidence could have supported either conclusion, which means that the district court could not have

clearly erred when it chose one of those options. United States v. Yusuff, 96 F.3d 982, 989 (7th Cir. 1996), cert. denied, 519 U.S. 1134 (1997). Thomas was closely linked with the ringleaders of the scam, two of whom were lifelong friends. Unlike Studley's crime, which lasted only a few weeks, Thomas's activity spanned more than two years. During that time, he had several close brushes with the law, but he managed to avoid spoiling things for himself and his colleagues. Thomas also went along with Williams on some of the latter's pick-ups, which evidenced at least minimal cooperation among the runners. Thomas's use of aliases to wire money exhibited an understanding of the scope of the offense and the roles of the various actors. Finally, his agreement to serve as a runner was essential to the success of the scheme and furthered the criminal activity of the group as a whole.

Like the district court, we are satisfied that these facts are enough to distinguish the present case from Studley and to justify the district court's finding that Thomas was responsible for all $32,885 collected by the group. We therefore Affirm the judgment of the district court.