In the
United States Court of Appeals
For the Seventh Circuit

Nos. 97-3821, 97-3826, 98-3885

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADETORO ADENIJI,
ADEMOLA G. ALLISMITH, and
ABDUL R. ADEDIRAN,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 CR 259--James T. Moody, Judge.

Argued April 23, 1999/*--Decided July 26, 2000

Before BAUER, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  A jury found the three
defendants in this case guilty of mail fraud.
They attack their convictions on a variety of
grounds that we find to be without merit.

I.

In April and May of 1991, the Motorola
Corporation issued a series of five checks
totaling $17,951.40 to Better Communications
Systems ("BCS") and Michael Owonla Marketer's
Inc. ("MOM"), purportedly two of its vendors. The
first four checks were mailed and cashed. When
Motorola did some investigating before mailing
the fifth check, it could locate no invoice to
support any of the five checks. Upon further
investigation, Motorola determined that its
employee, defendant Adetoro Adeniji, had covertly
caused each of the five checks to issue. BCS and
MOM turned out to be fictitious businesses whose
mailing addresses and bank accounts were
established by her two co-defendants, Ademola
Allismith and Abdul Adediran.

Motorola hired Adeniji in January 1990, under
the name Toro Williams (her married name). In
January 1991, the company assigned her to work in

the accounts payable department at the company's headquarters in Schaumburg, Illinois, as a data entry clerk. When an outside vendor provided goods and services to one of the Motorola entities in the United States--a "Motorolan"--the vendor would submit an invoice requesting payment; the Motorolan would then forward the invoice to the accounts payable department in Schaumburg. There the invoices were assigned to one of three processing groups organized alphabetically (A-G, H-O, and P-Z) based on the vendor name.

A batch control person in each group would quickly review the invoices to make sure they contained the information required for payment, including an account number and an authorizing signature. Once the batch control operator had reviewed the invoices, she would batch them into groups of between twenty-five and forty invoices, assign a control number to the batch and place the invoices into a folder, record certain information about each batch, including the total dollar amount billed on the invoices in that batch, on a batch control group log sheet ("batch log"), and assign the batch to a data entry clerk like Adeniji for processing. The identification number of the assigned clerk would be entered into the batch log. The data entry clerks had access to the batch logs, and they were free to visit the batch control person's office and log out batches of invoices for processing on their own.

Data entry clerks would then enter information from each invoice in the batch into the company's computer system, enabling checks to issue. This information included the vendor number, Motorola account number, date and number of the invoice, and dollar amount of the invoice. The clerk would also record the date she entered this data into the computer and the batch control number. After inputting the data from all of the invoices in the batch, the clerk would complete a control group ticket sheet, noting the total number of invoices in the batch, the total dollar amount billed on the invoices, the batch control number, the date of entry into the computer system, and her own operator identification number. It was the data entry clerk's responsibility to make sure that the total invoice dollar amount she entered on the control group ticket sheet jibed with the amount reflected in the batch log. Once all this was completed, the clerk would return the batch to the batch control person. Each clerk processed between two and three hundred invoices daily. Checks were issued and mailed to vendors three times weekly based on the information input by the data entry clerks.

In the course of processing the invoices, the data entry clerk might discover that the vendor identified on a particular invoice had not yet been set up in the company's database. In such cases, the clerk would take the invoice to the vendor file maintenance person in her group. This individual was responsible for assigning a unique identification number to each new vendor, after verifying the vendor's legitimacy. Once this was done, she would enter appropriate information for the vendor into the database (including such things as the terms of payment for this vendor), enabling data entry clerks to process invoices for the vendor.

In June 1991, Adeniji's supervisor, Judith Amerlan Johnson ("Amerlan"), began looking into the five checks that Motorola had issued in April and May to vendors MOM and BCS. Her investigation commenced after it became apparent that the total dollar amounts of the invoice batches from which these checks emanated were out of balance, and the invoices corresponding to these checks could not be found. In the course of her investigation, Amerlan reviewed the pertinent batches of invoices, the batch log sheets, the control group tickets, and two different computer records: the terminal screen printouts, and daily accounting activity reports for each data entry clerk. The terminal screen printout reflected the data for each invoice as entered into the computer system by the clerk, including the clerk's two-digit operating code. The accounting activity report tracked all of the invoices entered into the system by a particular clerk on a particular day. Because this report was keyed to the clerk's security password, which the clerk had to use in order to log on to Motorola's computer system, it was the most accurate record of the data that each clerk had actually entered into the system.

The accounting activity reports pointed to Adeniji as the clerk who entered the data for each of the five checks that Amerlan was investigating. The batch logs, the control group tickets, and the terminal screen printouts all indicated that clerks Linda Clark and Shirley Williams had input the data. But the accounting activity reports showed that Clark and Williams were either logged off of their terminals at the time the data was entered or busy entering data from other invoices. These reports revealed that Adeniji, in fact, was the person who had keyed in the information. Her time cards confirmed that she was working at these times. And, like any other data entry clerk, she knew her fellow clerks' operator code numbers. At least two other irregularities indicated that the five checks were issued improperly.

First, Amerlan was never able to find any of the invoices corresponding to these checks. The invoices underlying the first four checks were the only ones missing from their batches. On the other hand, the batch that included the invoice for the fifth check was missing altogether. Computer records indicated that Adeniji had entered the data for that fifth check six days after a different clerk (Shirley Williams) had completed the rest of the batch.

Second, on April 19, 1991, Adeniji had approached Carol Rickman, the vendor maintenance person for the H-O invoice group (recall that Adeniji worked in the A-G group) to ask why an invoice from MOM was on hold. That invoice had been forwarded to Rickman because MOM had not yet been validated and set up in Motorola's computer system. Adeniji told Rickman that someone from MOM had called her to ask why the company was not being paid. Rickman explained that she had already tried to call MOM and obtain its taxpayer's identification number, but without success. Adeniji urged Rickman to complete the verification as quickly as possible so that MOM's invoice could be processed right away. Later that same day, Adeniji returned to Rickman with a taxpayer i.d. number she said she had obtained from MOM. In violation of protocol, Rickman entered the number into the system without verifying it herself, assigned a vendor number to MOM, and gave the invoice to Adeniji, who input the data the same day. Adeniji would later deny having asked Rickman to establish MOM as a vendor, pointing out that as a member of the A-G alpha group, she would have nothing to do with MOM. Adeniji resigned from Motorola's employ on July 22, 1991.

Whereas Adeniji arranged for the checks to be issued, Adediran and Allismith arranged for their receipt. In early April 1991, Adediran, using the aliases "Michael Owonla" and "Michael Olowanla," rented commercial mailboxes in the Chicago suburbs of Northbrook and Vernon Hills, Illinois. All three of the checks that Adeniji caused Motorola to issue to MOM were later mailed to the Vernon Hills address. Adediran used both addresses to open three different checking accounts--all under the name Michael or Micheal C. Owonla--in Vernon Hills, Riverwoods, and Northbrook. One of the three Motorola checks issued to MOM was deposited into each of these accounts; Adediran's fingerprint was later identified on one of the checks. Each account was closed by the end of May, 1991, with a negative balance. Tellers from two of these banks identified Adediran as the individual who engaged in transactions at the banks as "Michael Owonla".

At the end of March, 1991, Adediran opened a fourth checking account at the Uptown National Bank in Chicago. The account was for a company named Beta Enterprises, and on the account application, Adediran identified "Babatunde Adediran" as the authorized signer on the account. A handwriting expert identified the signature on three different documents associated with this account as Adediran's. On May 11, Adediran wrote a check on this account in the amount of $3,000 to Toro Williams, the name that Adeniji used while in Motorola's employ. That check was later deposited into a joint bank account that Adeniji maintained with her husband at another bank.

Allismith's activities were quite similar. In mid-May, 1991, Allismith rented a post office box in the Rogers Park neighborhood of Chicago for BCS using the name "Steve T. Howard." (A handwriting expert was able to positively identify some of the entries on the application form as Allismith's.) This was the address reflected on both of the checks that Motorola issued to BCS. Also in mid-May, Allismith opened a checking account at the Uptown National Bank under the name "Henry A. Smith." On the same day that Allismith opened this account, Adediran withdrew $3,000 in cash from one of his Owonla checking accounts. Two days later, $3,000 in cash was deposited into the Henry Smith account. In early June, Allismith opened a second account at the Uptown National Bank under the name "Henry A. Smith D/B/A Better Communication Systems." He opened the account with one of the two checks that Motorola issued to BCS. A handwriting expert would later identify handwriting on documents associated with both of the accounts at the Uptown National Bank, as well as the endorsement of the Motorola check, as Allismith's handwriting.

A postal inspector was unable to verify the existence of either BCS or MOM. The inspector went to each of the mailboxes linked to the two companies, and in turn to the addresses listed on the applications for those boxes, but could find no evidence of an operating business.

Telephone records revealed a series of phone calls between telephones registered or assigned to Adeniji and her co-defendants (in some cases, under their aliases) beginning in February 1991 and continuing through early October 1991. Many of these calls took place on dates when key events in the scheme to defraud Motorola took place--when Adeniji inputted data from one of the MOM or BCS invoices into the Motorola payment system, for example, or Adediran opened a bank account. So far as the telephone records reveal,

however, Adediran and Allismith never spoke to each other. The records reflect calls between Adeniji and Adediran, and Adeniji and Allismith, but no calls between Adediran and Allismith.

II.

A.

Adediran and Allismith contend that the evidence was insufficient to convict them of mail fraud./1 Our review of the sufficiency of the evidence is highly deferential. E.g., United States v. Woolfolk, 197 F.3d 900, 904 (7th Cir. 1999), cert. denied, 120 S. Ct. 1705 (2000). Only when the evidence, viewed favorably to the government, would permit no reasonable jury to find the defendant guilty of the crime charged will we reverse the conviction. Id. Adediran and Allismith argue that without proof that neither MOM nor BCS ever provided any goods or services to Motorola, the jury could not reasonably find that they intended to defraud Motorola.

Although no Motorola witness ever confirmed that MOM and BCS were not legitimate vendors, the jury could still find beyond a reasonable doubt that Adediran and Allismith were defrauding Motorola. First, none of the invoices supporting the five checks issued to MOM and BCS could be found. Second, Adeniji input the data from these (putative) invoices in a manner which bespoke fraud: she used other operators' codes, and logged the invoices into batches assigned to those operators, in an effort to conceal her own connection to the checks. Third, Adeniji personally intervened with the vendor maintenance person for the H-O alpha group to have MOM approved as a vendor, although Adeniji did not even work in that group. Fourth, Motorola was given commercial or post-office mailbox addresses for both MOM and BCS that Adediran and Allismith had rented under aliases. Fifth, MOM and BCS purportedly issued the invoices to Motorola before either vendor had established a mailing address or bank account. For example, the data that Adeniji entered into Motorola's accounts payable system indicated that MOM's first invoice to Motorola was dated February 12, 1991. Yet, Adediran did not rent the commercial mailbox used as MOM's vendor address until April 3, 1991, and he did not open any of the three checking accounts into which the MOM checks were deposited until the second week of April. Likewise, although the putative invoices underlying the two checks issued to BCS were (according to the data input by Adeniji) issued in December 1990 and January 1991, Allismith did not rent the post office box for BCS or obtain an assumed name certificate for the company until May 1991, and he did not open a bank account for the business

until June. Sixth, each of the bank accounts into which Adediran and Allismith deposited the checks from Motorola was opened under an alias. Seventh, when he visited the residential addresses that Adediran and Allismith had given in renting the mail boxes for the two companies, the postal inspector could not confirm that either MOM or BCS was an actual, legitimate business. These circumstances, among others, supply more than ample proof that Adediran and Allismith intended to defraud Motorola.

Allismith secondarily argues that the evidence did not establish his joint participation in the scheme to defraud Motorola with Adeniji and Adediran. As we mentioned earlier, there is abundant proof of telephone calls between Allismith and Adeniji on the one hand, and Adeniji and Adediran on the other, but no direct proof of contact between Allismith and Adeniji. Indeed, as Allismith points out, there is no proof that he and Adediran even knew one another.

Whether or not the government established a direct link between Adediran and Allismith is irrelevant, however. The joint agreement that is essential to a defendant's liability for the crime of conspiracy is not a prerequisite to a conviction for mail fraud. United States v. Read, 658 F.2d 1225, 1240 (7th Cir. 1981); accord, United States v. Bibby, 752 F.2d 1116, 1124 (6th Cir. 1985), cert. denied, 475 U.S. 1010, 106 S. Ct. 1183 (1986); United States v. Camiel, 689 F.2d 31, 36 (3rd Cir. 1982). Allismith need not even have been aware of Adediran's identity or his specific acts in furtherance of the fraudulent scheme, so long as the evidence adequately establishes Allismith's own knowing participation in the same scheme. United States v. Wilson, 506 F.2d 1252, 1257 (7th Cir. 1974); see also United States v. Silva, 781 F.2d 106, 108-09 (7th Cir. 1986); United States v. Wormick, 709 F.2d 454, 461 (7th Cir. 1983).

The record lends ample support to the jury's conclusion that Allismith was liable as a participant in a single scheme to defraud Motorola. Adeniji, of course, worked at the core of this scheme, arranging for all five checks to issue to MOM and BCS; and one can infer from the telephone records that Allismith was in telephonic contact with her throughout the life of the scheme. See infra at 17-18. For his part, Allismith established a mailing address and bank account for BCS in much the same manner that Adediran did for MOM, and closely on the heels of Adediran's efforts. These facts establish one unified scheme to defraud the same victim (Motorola). Moreover, Allismith not only set up the post office box and bank account for Motorola

using aliases, he also received and negotiated the one check to BCS that Motorola placed in the mail before its suspicions were aroused. These actions betray Allismith's knowing participation in the scheme. Additional evidence linking him to Adediran was therefore unnecessary. We note, however, that Allismith made a cash deposit of $3,000 into one of the "Henry A. Smith" accounts at the Uptown National Bank two days after Adediran withdrew the same amount in cash from one of the "Michael Owonla" bank accounts and five days after Adediran wrote a check in the same amount to "Toro Williams," the name that Adeniji used at Motorola. These transactions took place shortly after Motorola issued the three checks to MOM totaling $10,440.40, and considered with all of the other evidence, reasonably suggest that Adediran was sharing the proceeds of the MOM checks with Allismith as well as Adeniji. See infra at 14-15.

B.

Allismith contends that the district court improperly refused an instruction that would have directed the jury not to consider any of the evidence offered against his co-defendant Adediran, or which related to the scheme as it involved Adediran and Adeniji, unless the jury was persuaded beyond a reasonable doubt that Allismith "associated himself in a common scheme with defendant Adediran." R. 86, Allismith Instruction No. 4. The evidence regarding the MOM component of the scheme arguably was the stronger part of the government's case: Adediran had opened a series of three different checking accounts in Michael or Micheal Owonla's name, MOM was established as a Motorola vendor after Adeniji herself intervened with Carol Rickman, and ultimately three different checks were issued to MOM and deposited into an Owonla account. This evidence was unduly prejudicial to Allismith, he argues, in the absence of proof that BCS, like MOM, was not a genuine venture and that Allismith was, in fact, co-scheming with Adediran.

The district court properly rejected the instruction, however. As we have already pointed out, the evidence established a single scheme to defraud Motorola irrespective of whether or not Adediran and Allismith knew exactly what the other was doing. Although, as our discussion thus far also makes clear, mail fraud and conspiracy are distinct offenses with distinct elements, certain evidentiary principles apply to both crimes. Principal among these is that evidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy case. United States v. Read, supra,

658 F.2d at 1239, citing United States v. Serlin, 538 F.2d 737, 743 (7th Cir. 1976); see also United States v. Silva, supra, 781 F.2d at 108-09; United States v. Dick, 744 F.2d 546, 552 (7th Cir. 1984); United States v. Wormick, supra, 709 F.2d at 461; United States v. Joyce, 499 F.2d 9, 16-17 (7th Cir.), cert. denied, 419 U.S. 1031, 95 S. Ct. 512 (1974). The district court in this case found that there was but one scheme to defraud Motorola, and that finding rendered the evidence relating to Adediran and the MOM component of the scheme admissible against Allismith. The notion that Allismith was unfairly prejudiced by that evidence is untenable. However compelling the evidence against Adediran may have been, additional proof--including the use of aliases to open a post office box and bank account for BCS, the fraudulent issuance of checks to BCS, and the endorsement and deposit of one of those checks into an account Allismith had opened for BCS-- unquestionably demonstrated Allismith's own deliberate actions in furtherance of the fraud. Moreover, as the government reminds us, the jury was instructed to give separate consideration to each defendant, to assess each defendant's culpability based on his or her own actions, and in particular to determine, based on the defendant's own acts and statements, whether each defendant was aware of the scheme's common purpose and became a willing party to the scheme. Tr. 1246-47, 1250, 1252-54. We presume that the jury followed these instructions. E.g., United States v. Hernandez, 84 F.3d 931, 935 (7th Cir. 1996); United States v. Anderson, 61 F.3d 1290, 1300 (7th Cir.), cert. denied, 516 U.S. 1000, 116 S. Ct. 543 (1995).

C.

When the district court determined the amount of loss in sentencing Allismith, see U.S.S.G. sec. 2F1.1(b)(1), it held him to account not only for the two BCS checks but also for the three MOM checks that Motorola mailed to Adediran. Allismith Sentencing Tr. 15. Section 1B1.3(a)(1)(B) of the Guidelines indicates that when the defendant engaged in a criminal scheme with other individuals, the court should calculate the loss based not only on the defendant's own actions, but "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The guideline therefore poses two separate questions with respect to the loss amount that can be attributed to the defendant: (1) Were the acts resulting in the loss in furtherance of jointly undertaken criminal activity? and (2) Were those acts reasonably foreseeable to the defendant? See id. (comment.) (n.2); United States v. Thomas, 199 F.3d 950, 953 (7th Cir. 1999). Judge Moody

answered both questions in the affirmative. He found that there was a single scheme to defraud Motorola in which Allismith participated, and that the individual efforts of Adediran and Allismith represented coordinated prongs of that scheme. See R.119 at 5-6; Allismith Sent. Tr. 15. He found further that the acts culminating in the issuance of the three checks to MOM were reasonably foreseeable to Allismith. Allismith Sent. Tr. 15. Allismith contends that the court erred in both assessments, given the lack of direct proof that he was involved in the MOM component of the scheme. Both determinations are findings of fact subject to review for clear error. Thomas, 199 F.3d at 953-54; United States v. Jarrett, 133 F.3d 519, 531 (7th Cir.), cert. denied, 523 U.S. 1112, 118 S. Ct. 1688 (1998).

Allismith argues in the first instance that the MOM prong of the scheme was beyond the scope of the criminal activity to which he agreed. His argument in this regard is founded in principal part upon the multi-factor test that the Second Circuit articulated in United States v. Studley, 47 F.3d 569, 575 (2d Cir. 1995). Studley identified three factors that bear on the scope of the activity that the defendant agreed to jointly undertake with others: (1) whether the participants in the activity pooled their profits and resources, or worked independently; (2) whether the defendant assisted in designing and executing the scheme; and (3) what role the defendant agreed to play in the operation. Here, Allismith argues, there is no evidence that he had any part in designing the scheme, no evidence that he and his co-defendants pooled profits and resources, and no evidence that he agreed to play any role in the scheme apart from the activities related to BCS. We have yet to embrace Studley as authoritative, however. Instead, we have consistently distinguished the facts presented to us from the facts that the Second Circuit found insufficient to establish a joint undertaking in that case. See Thomas, 199 F.3d at 953 (collecting cases). So long as we are satisfied that the facts permit the inference that the defendant agreed to jointly undertake the acts for which he is being held to account, we will sustain the district court's determination even if those facts do not fit neatly within the Studley framework. See Thomas, 199 F.3d at 953-54; United States v. Giang, 143 F.3d 1078, 1080-81 (7th Cir. 1998); United States v. Senn, 129 F.3d 886, 898 (7th Cir. 1997); United States v. Boatner, 99 F.3d 831, 837 (7th Cir. 1996).

We believe that the record lends adequate support to the district court's finding that Allismith agreed to a joint undertaking that embraced the entire scheme, not just the BCS

component. There was, as we have already emphasized, a single scheme to defraud at work here. It was not a scheme to defraud multiple victims, as was true in Studley, but rather one victim, Motorola. See Boatner, 99 F.3d at 837. Furthermore, Adediran and Allismith took virtually identical steps in setting up mailing addresses and bank accounts for the fictional BCS and MOM vendors. See Giang, 143 F.3d at 1080. They did so within the same period of approximately 8 to 9 weeks in April, May, and early June of 1991, and contemporaneously with Adeniji's own efforts to arrange for the issuance of the checks. Multiple telephone calls between phones associated with Adediran and Allismith on the one hand, and with Adeniji on the other, supply confirmation that all three defendants were coordinating their activities. Finally, there is the fact that Allismith made a $3,000 cash deposit into one of the "Henry A. Smith" accounts at the Uptown National Bank just two days after Adediran withdrew the same amount in cash from one of the "Michael Owonla" bank accounts and five days after Adediran wrote a check in the same amount to Adeniji. In a vacuum, we agree with Allismith that it would be sheer speculation to infer a link between those three transactions. But considered against the backdrop of the fraudulent scheme, we believe it is plausible to infer that Adediran, Adeniji, and Allismith were, in fact, sharing the proceeds of the checks that Motorola issued to MOM--a factor that Studley itself identifies as relevant. 47 F.3d at 575. Cumulatively, all of these circumstances permitted the district court to find, by a preponderance of the evidence, that the issuance of checks to MOM was a joint undertaking among all three defendants, including Allismith.

Allismith separately contends that there is no evidence that Adediran's actions in furtherance of the scheme were foreseeable to him. There is no evidence that he ever had a discussion with Adeniji about Adediran or his activities, Allismith maintains, and no evidence that he ever had contact with Adediran or knew that Adediran caused Motorola to issue checks to MOM.

We reject this argument for the same reasons we have found the evidence sufficient to establish a joint undertaking. Granted, there is no evidence concerning the content of Allismith's conversations with Adeniji, and no evidence of any contact or conversations between Allismith and Adediran. Still, the fact that both men coordinated their efforts with Adeniji, the fact that both took nearly identical steps closely in time to establish mailing addresses and bank accounts to receive funds from MOM and BCS, and the apparent sharing of the proceeds from the

three MOM checks, all permitted the district court to find that the actions of Adediran were foreseeable to Allismith.

For these reasons, we find no clear error in the district court's decision to hold Allismith to account for the full amount of money (i.e., the total of all five checks) put at risk by the fraudulent scheme.

D.

The district court ordered Allismith to make restitution in the amount of $13,951.40, which represents the total of the four checks that were actually sent to Adediran and Allismith. (Recall that the fifth check was never sent.) Allismith argues in the first instance that it was improper for the court to impose a restitution obligation for any of the checks to MOM, but we reject that argument for the same reasons we have overruled his contention that the MOM losses were not part of his joint undertaking with the two other defendants and were not foreseeable to him. Allismith also points out that both Adediran and Adeniji were likewise ordered to make restitution in the same amount; and he appears to suggest that this raises the possibility of excessive (i.e., duplicative) restitution. Yet, the judgment makes clear that his obligation will be discharged once payments by any or all of the defendants have totaled $13,951.40. R. 124 at 5. Congress has specifically authorized joint and several liability for restitution in cases involving joint criminal endeavors, see 18 U.S.C. sec. 3664(h), and we have previously indicated that such restitution orders are appropriate, so long as the total restitution mandated does not exceed the amount of the loss. E.g., United States v. Trigg, 119 F.3d 493, 501 & n.6 (7th Cir. 1997).

E.

Finally, Adeniji contends that in five different instances during opening statements and closing arguments, prosecutors made remarks that were improper. No contemporaneous objection was made to four of these remarks, and because none of them approaches the gravity of plain error, see, e.g., United States v. Robbins, 197 F.3d 829, 843 (7th Cir. 1999); United States v. Hartmann, 958 F.2d 774, 785 (7th Cir. 1992), we shall confine our discussion to the one line of argument that Adeniji objected to at trial.

While laying out the evidence against Adeniji and her co-defendants in closing, the government referred repeatedly to telephone conversations between Adeniji and her co-defendants. The

assertion that Adeniji was conferring by phone with Adediran and Allismith was based, of course, on the telephone records that reflected the many calls between numbers associated with Adeniji and with her co-defendants. But Adeniji argues, as she did (unsuccessfully) to the district court, that because the telephone records relied upon by the government do not reveal either the content of the conversations or the speakers, it was improper for the government to assert that Adeniji was a party to any of the telephone calls.

The government may properly put before the jury the inferences that one can reasonably draw from the evidence, however, United States v. Ward, 211 F.3d 356, 365 (7th Cir. 2000), and for that reason we find nothing improper in the prosecutor's argument. See, e.g., United States v. Poole, 207 F.3d 893, 899 (7th Cir. 2000) (first step in assessing whether prosecutor committed misconduct in closing argument is to examine objected-to comment in isolation to determine whether it was improper). Records that reflect calls to and from telephone numbers associated with the participants in a criminal scheme permit the inference that the participants were in telephonic contact with one another; and where, as here, the timing and frequency of the calls coincide with key events in the scheme, one may reasonably infer that the participants were consulting one another in regard to those events. See, e.g., United States v. Magana, 118 F.3d 1173, 1202 (7th Cir. 1997), cert. denied, 522 U.S. 1139, 118 S. Ct. 1104 (1998), quoting United States v. Garcia, 35 F.3d 1125, 1129 (7th Cir. 1994); United States v. Knox, 68 F.3d 990, 999 (7th Cir. 1995), cert. denied, 516 U.S. 1119, 116 S. Ct. 926 (1996); and see United States v. Theodosopoulos, 48 F.3d 1438, 1451 (7th Cir.), cert. denied, 516 U.S. 871, 116 S. Ct. 191 (1995) (collecting cases). Of course, it is theoretically possible that persons other than the defendants were parties to the telephone calls at issue in this case, and even if the defendants themselves were conversing, they were not necessarily speaking about the scheme to defraud Motorola. But it would have been reasonable for the jury to infer that that these calls reflected conversations between Adeniji and her co-defendants about the nuts and bolts of the effort to defraud Motorola. And because the jury was entitled to draw that inference, it was entirely appropriate for the prosecutor to argue that inference in his closing remarks.

III.

For the reasons set out above, we AFFIRM the defendants' convictions and sentences.

/* On the appellant's motion, the appeal of Adetoro Adeniji was submitted without argument and decided on the briefs and record alone.

/1 On the same grounds that Adediran challenges the sufficiency of the evidence, he maintains that the district court erroneously denied his motions for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. As the thrust of both lines of attack is the same, we need not address the denial of the Rule 29 motion separately. See United States v. Douglas, 874 F.2d 1145, 1155 & n.12 (7th Cir.), cert. denied, 493 U.S. 841, 110 S. Ct. 126 (1989).