In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-3682 & 10-3715

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

AIDA SALEM and BOGDAN GANESCU,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 923—**John W. Darrah**, *Judge*.

ARGUED MAY 31, 2011—DECIDED SEPTEMBER 9, 2011

Before EASTERBROOK, *Chief Judge,* and WOOD and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Aida Salem and Bogdan Ganescu come before us again in these successive appeals. Salem pled guilty to one count of wire fraud, *see* 18 U.S.C. § 1343, and Ganescu pled guilty to several counts of wire fraud and two counts of receipt of stolen funds, *see* 18 U.S.C. §§ 1343, 2315, arising out of their participation in an internet fraud scheme. In their first appeal, we held that

the district court erred in not making certain findings regarding the jointly undertaken criminal activity under U.S.S.G. § 1B1.3(a)(1)(B) and we remanded. *See United States v. Salem*, 597 F.3d 877 (7th Cir. 2010).

The parties returned to the district court where they filed sentencing memoranda and were heard at a joint sentencing hearing. At the end of the hearing, the district court made findings and sentenced Salem to 97 months' imprisonment and Ganescu to 78 months' imprisonment, the same sentences that the district court originally imposed. Salem and Ganescu appealed, contending that the district court erred in concluding that they may be held accountable for the conduct of their co-conspirators under U.S.S.G. § 1B1.3(a)(1)(B). They assert that the evidence failed to show that they "assisted or agreed to promote" the criminal conduct of their co-conspirators. (Ganescu concedes accountability for the criminal conduct of two co-conspirators—Gianina Simon and Emanuel Matula.) Because the district court made the appropriate findings and the record and reasonable inferences drawn therefrom support its findings, we affirm.

## I. Background

Between November 2003 and at least August 2006, more than two thousand fell victim to the internet fraud scheme in which Salem and Ganescu participated with others. Individuals outside the United States, often based in Romania (the "foreign co-schemers"), posed as sellers of goods on eBay and other internet auction

sites. The victims of the scheme were directed to send payment by wire transfer, typically through Western Union. The foreign co-schemers developed a network of individuals in the United States, including numerous co-schemers in the Chicago area, who collected payment using false identifications. The co-schemers kept a percentage of the proceeds for themselves and forwarded the remainder to the foreign co-schemers.

Following their guilty pleas, Salem and Ganescu were sentenced and then appealed. They argued that the district court erred in applying U.S.S.G. § 1B1.3(a)(1)(B) and in making its relevant conduct findings. In the first appeal, we agreed that the court erred and remanded for further findings regarding the jointly undertaken criminal activity. *See Salem*, 597 F.3d at 886-89, 890-91. Specifically, we instructed the district court to determine the scope of the criminal activity that Salem and Ganescu agreed to jointly undertake. *Id.* at 890. Regarding Salem, we directed the court to "determine whether the acts of [Adrian Fechete, Gabriel Constantin, Ioan Moloman, Mihail Hann, Marian Alexandru, Mihai Panaitescu, Constantin Lucan, Stefan Dumitru, and Lucian Nanau] were in furtherance of that jointly undertaken criminal activity." *Id.* Salem did not challenge the district court's finding that those co-schemers' acts were reasonably foreseeable to him. Because the district court had omitted a reasonable foreseeability finding as to co-schemer Mihai Bledea, we stated that appropriate findings should be made as to him as well. *Id.*

We also ruled that Salem waived any right to challenge the district court's determination that he was accountable for the conduct of Raimondoray Cerna and Adrian Ianc. *Id.* In addition, we directed the district court to "determine whether the acts of Ianc, Constantin, Bledea, and EM (Emanuel Matula) were in furtherance of Ganescu's . . . jointly undertaken criminal activity." *Id.* at 891. Ganescu did not contest the district court's findings regarding the reasonable foreseeability of the acts of these co-schemers. We noted that Ganescu conceded he was liable "for Simon's conduct [and] Emanuel Matula's conduct. . . ." *Id.* We refer the reader to *Salem*, *id.* at 879-84, for further background regarding the scheme and Salem's and Ganescu's specific roles and involvement in the scheme.

On remand, the parties filed additional sentencing memoranda and the district court held a joint sentencing hearing. After hearing argument, the district court made additional findings. The court first described the fraud scheme generally as an internet fraud scheme in which "victims were led to believe that they were purchasing items that had been listed for sale on the internet, typically via eBay." The victims would send money to the purported seller, and no goods were received in return. The court found that the "Chicago area recruits, the so-called 14 Chicago area defendants" participated in the fraud scheme between November 2003 and August 2008, by working with the foreign co-schemers to obtain the victims' funds and perpetuated the scheme by returning a percentage of those funds to the Romanian co-

schemers. It also found that the Chicago area defendants picked up the fraud proceeds, typically retained between twenty and forty percent of the funds, and sent the remainder to the Romanian co-schemers. More specifically, the court found that the Chicago area defendants participated in the scheme by obtaining multiple, false identification documents to use when receiving the fraud proceeds from Western Union; recruiting others to receive the fraud proceeds from Western Union; causing the names of aliases and names of recruits to be communicated to the foreign co-schemers; receiving and directing others to receive fraud proceeds from Western Union, all in the Chicago area; and transmitting or causing the transmission of a portion of the fraud proceeds to the foreign schemers. The false identifications, the court concluded, were "obviously protection against being detected in cashing these checks."

The district court found that "Ganescu agreed to jointly undertake this scheme that I've just generally described" with Ianc, Constantin, Bledea, and Matula, and "Ganescu agreed to participate in this scheme with them jointly." The court further found that the conduct of Ianc, Constantin, Bledea, and Matula was in furtherance of this jointly undertaken criminal activity. These findings were based on the following factors outlined in the presentence investigation report, the government's version of the offense and the sentencing submissions (the court noted that "the government's submission in this regard was not contested"): similarities in the modus operandi, including the use of fictitious bank accounts for fictitious vendors, the internet solicita-

tion scheme, and similar email presentations, even as to typographical errors; Ganescu's knowledge of the scope of the scheme, including the fact that these co-schemers associated with each other and the evidence supported the inference that Ganescu was aware of the participation in the scheme by the others "just named"; coordination among the co-schemers "just mentioned," including the shared common sources of Western Union transactions, the travel together between currency exchange locations, and the sharing of other information; and Ganescu's length of participation in the scheme (his participation began in August 2004). The court noted that some of the named co-schemers caused the proceeds to be wire-transferred to Romania, which "would be joint proceeds in many instances." In addition, telephone records indicated constant contact between the co-schemers. The court expressly adopted all pertinent parts of the presentence investigation report as to the relevant conduct issue and found that Ganescu's total offense level was 28, that his criminal history category was I, and again sentenced him to a within-guideline sentence of 78 months.

The district court found that Salem agreed to jointly undertake criminal activity with Cerna, Fechete, Ianc, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau. It adopted its statement of the overall scheme that it made in sentencing Ganescu, without objection from the parties. The court also found that the conduct of the co-schemers it identified (Cerna, Fechete, Ianc, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau) was in further-

ance of Salem's jointly undertaken criminal activity. (It included Cerna and Ianc even though it thought Salem waived any issue as to his accountability for their conduct.) Initially, the court apparently misspoke and said that the conduct of these co-schemers was in further-ance of "this conspiracy," but quickly clarified that it was finding that their conduct was in furtherance of "the jointly undertaken criminal activity." The court stated that its "in furtherance" finding was based on "everything that I've read, including the government's submis-sion, which was not objected to, at least the factual parts[.]" Earlier in the hearing, the court expressly stated that it had read the plea agreements, the presentence investigation reports, including corrected and supple-mental reports, the defendants' submissions, and the government's version of the offense, including attach-ments. Thus, we can conclude that the court's "in further-ance of" finding was also based on these documents. The court specifically cited the following evidence as support for its finding that the co-schemers' conduct was in furtherance of the jointly undertaken criminal activity: similar modus operandi, including the use of similar presentations on the internet; Salem's knowl-edge of the scope of the scheme; the interrelationship between the named co-schemers and Salem; the coordina-tion among them—sharing false addresses and tele-phone numbers, frequent use of common fake identifica-tions, and maintenance of common bank accounts; tele-phone records indicating the communications between them; and the length of Salem's participation in the scheme. Then the court determined that Salem's total

offense level was 28 and that his criminal history cate-
gory was II, and imposed a within-guideline sentence of
97 months.[1]

## II. Discussion

We review the district court's interpretation and ap-
plication of the sentencing guidelines de novo and review
its factual findings for clear error. *United States v.
Wright*, Nos. 10-1249 & 10-1956, 2011 WL 2683198, at *8
(7th Cir. July 12, 2011). A factual finding is clearly er-
roneous only if after reviewing the evidence we are
" 'firmly convinced' that a mistake has been made." *United
States v. Shamah*, 624 F.3d 449, 458 (7th Cir. 2010), *cert.
denied*, 131 S. Ct. 1529 (U.S. Feb. 22, 2011). The district
court may draw reasonable inferences from the record
in making its factual findings at sentencing. *See United
States v. Cruz-Rea*, 626 F.3d 929, 928 (7th Cir. 2010)

---

[1] The district court made specific findings regarding Bledea
but in connection with its findings regarding Ganescu's ac-
countability rather than Salem's, which was error. However,
this error was harmless because the transactions conducted by
Bledea resulted in a loss amount of no more than $389,000 and
involved around 178 victims. Even if this loss is not counted
in the total loss amount, the total loss exceeds $1,000,000 but
is less than $2,500,000, making the 16-point increase in
offense level appropriate under U.S.S.G. § 2B1.1(b)(1). And
if these victims are not counted in the total number of
victims, the total still far surpasses the 250 victims necessary
for the 6-point increase under U.S.S.G. § 2B1.1(b)(2)(C).

("[W]hen a district court chooses between two permissible inferences from the evidence, the factual findings cannot have been clearly erroneous."); *Salem*, 597 F.3d at 889 (same).

Under U.S.S.G. § 1B1.3(a)(1)(B), "a defendant may be held accountable for the conduct of others 'if that conduct was in furtherance of a jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.'" *Salem*, 597 F.3d at 884-85 (quoting *United States v. Fouse*, 578 F.3d 643, 653 (7th Cir. 2009)). The defendants argue that to establish jointly undertaken criminal activity, the government had to prove that they "assisted or agreed to promote" a co-conspirator's conduct, which they interpret as "doing something to help the co-conspirator commit his/her criminal acts." In doing so, they attempt to resurrect arguments raised in their first appeal. In *United States v. Soto-Piedra*, we said that the "[a]ctions of coconspirators that a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity." 525 F.3d 527, 533 (7th Cir. 2008). In *Salem*, we interpreted the "assist or agree to promote" language as restating "the requirement that the conduct of others for which a defendant is accountable must be in furtherance of the joint criminal activity that the defendant in question undertook." 597 F.3d at 885. None of our cases requires that a defendant at the bottom of a conspiratorial hierarchy or pyramid engage in some affirmative conduct to help a co-conspirator commit each of his or her criminal acts before the defendant may be held accountable for such acts.

Nor have we required a co-conspirator-by-co-conspirator analysis when determining the scope of the jointly undertaken criminal activity.

Rather, the district court "may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 cmt. n.2; *see also Soto-Piedra*, 525 F.3d at 532. Several factors are relevant in determining the scope of jointly undertaken criminal activity: (1) the existence of a single scheme, *see United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir. 2000); (2) similarities in modus operandi, *see id.* 1028-29 (noting that the defendants "took virtually identical steps in setting up mailing addresses and bank accounts for the fictional . . . vendors" closely in time); (3) coordination of activities among schemers, *see id.* at 1028 (multiple telephone calls between phones associated with the defendants confirmed that they were coordinating their activities); *United States v. Giang*, 143 F.3d 1078, 1081 (7th Cir. 1998) (stating that the defendant's "close collaboration with his cohorts" established a joint undertaking); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(8); (4) pooling of resources or profits, *see Adeniji*, 221 F.3d at 1028 (sharing of proceeds); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(6); (5) knowledge of the scope of the scheme, *see United States v. Thomas*, 199 F.3d 950, 954 (7th Cir. 1999); and (6) length and degree of the defendant's participation in the scheme, *see id.*

On remand, the district court made appropriate findings regarding jointly undertaken criminal activity, and its findings are well-supported by the record and

reasonable inferences drawn therefrom. In this case, there is a single scheme, similarities in modus operandi, coordination of activities among co-schemers, and sharing of resources, including information and rides to currency exchanges. Further, both Salem and Ganescu knew of the scope of the scheme and participated in it fully and for a lengthy time period—more than two years. And by returning a portion of the fraud proceeds to the Romanian schemers, the Chicago area co-schemers, including Salem and Ganescu, "would ensure that repeat business would be sent their way," *United States v. Aslan*, 644 F.3d 526, 530 (7th Cir. 2011), thus promoting the scheme and other co-schemers' activities. The evidence raised a reasonable inference that Salem and Ganescu and the co-schemers identified by the district court were working together in jointly underaken criminal activity, as opposed to working independently and autonomously. By working together and coordinating their efforts, Salem and Ganescu assisted and furthered (or promoted) the other co-schemers' criminal acts which were part of the joint criminal activity. Contrary to the defendants' assertion, and as the record shows, the district court did not conclude that by participating in the scheme, Salem and Ganescu agreed to advance the goals of the entire scheme and are thus accountable for jointly undertaken activity. Their assertion is further undermined by the fact that they were not held accountable for the conduct of all the Chicago area defendants.

Despite the defendants' contention, *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), is not on "all fours"

with this case. *Studley* involved a telemarketing loan fraud scheme. Studley was hired as a sales representative to process calls from would-be borrowers. *Id.* at 571. The evidence did not show that Studley did anything to further the scheme outside of his own sales efforts or that he assisted other sales representatives with their sales. *Id.* at 576. Further, Illustration (c)(7) of Application Note 2 to U.S.S.G. § 1B1.3, which shows that a defendant's knowledge of the scope of an overall conspiracy is insufficient to hold him accountable for the activities of the entire conspiracy, is of no help to the defendants in this case. As should be apparent by this point in our opinion, the district court did not hold Salem and Ganescu accountable solely based on their awareness of the scope of the entire scheme.

### III.  Conclusion

The district court made appropriate findings on remand, and its findings are supported in the record. We therefore AFFIRM its judgments.