In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1219, 10-1338 & 10-1607

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANNETTE N. SANDOVAL, APRIL HICKS,
and SEAN VANDERHACK,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 00627—**David H. Coar**, *Judge.*

ARGUED APRIL 14, 2011—DECIDED DECEMBER 27, 2011

Before EASTERBROOK, *Chief Judge*, and ROVNER, and
SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* When most people think of
fencing, the combat sport played with swords comes
to mind. The defendants here, however, engaged in
fencing of the criminal sort—namely, reselling high-end
stolen goods to third parties at discounted prices. The
defendants worked together to steal credit card informa-

tion from retail establishments and fraudulently order merchandise that they then kept, resold, or returned for cash or merchandise credit. Their scheme unraveled in part because loss-prevention agents at stores such as Neiman Marcus and Saks Fifth Avenue became suspicious of the schemers' extravagant orders for next-day delivery. Seven individuals were convicted in all, and three defendants appeal. On appeal, they challenge only their sentences, which vary in range from 144 down to 21 months' imprisonment. We consider the three defendants' arguments in turn. For the reasons stated below, we affirm in all respects.

## I.

## A.

Annette Sandoval orchestrated the conspiracy.[1] Throughout 2007, she and her coconspirators stole clientele books from high-end department stores such as Neiman Marcus, Saks Fifth Avenue, and Bloomingdale's. Clientele books are maintained by store sales associates and contain information on valued customers such as their names, addresses, clothing preferences, birthdays, and,

---

[1] The government originally returned indictments against the defendants charging them with participating in a scheme to defraud, *see* 18 U.S.C. §§ 1029, 1341-43, but later filed superseding indictments charging a conspiracy under § 1028A-1029(a)-(b) (identity theft and conspiracy to commit fraud related to access devices).

most importantly for our purposes, credit card numbers. Sandoval and her coconspirators would then use the credit card numbers to order thousands of dollars worth of merchandise. She would arrange for the merchandise to be either held for pick-up or express shipped to various destinations inside and outside of Illinois. Sandoval's coconspirators would then retrieve the stolen merchandise. Depending on the package delivery method, the defendants would pick it up from the store, steal it from the porch of the delivery address (often the victim herself), or intercept the delivery person and claim to be the intended recipient. After retrieving the merchandise, Sandoval's coconspirators would bring it to her. She would keep some of it herself and then do one of two things with the rest: sell or "fence" it to third parties at discounted prices or return it to the store for cash or merchandise credit. For their part in the scheme the coconspirators would receive payment or a portion of the merchandise.

Sandoval pleaded guilty to conspiracy to commit access device fraud, 18 U.S.C. § 1029(b)(2) (Count I), attempted possession of access devices, *id.* § 1029(a)(3) (Count II), and aggravated identity theft, *id.* § 1028A(a)(1) (Count III). The only issue Sandoval raises on appeal relates to the calculation of the number of victims for sentencing purposes. When sentencing Sandoval, the district court calculated her advisory guideline range using the November 2009 version of the Sentencing Guidelines. Under § 2B1.1(b)(2)(B), she received a four-level increase in her offense level because her crime had more than 50 victims. This increase resulted in a guideline range of

120-150 months. Over Sandoval's objection about the calculation of victims, the district court sentenced her to 120 months on Counts I and II (to run concurrently) and added a consecutive 24-month sentence on Count III as required by 18 U.S.C. § 1028A(b) (mandating a concurrent sentence for aggravated identity theft conviction).

Sandoval's argument hinges on a change between the guidelines in effect when she committed her crime and the version used for sentencing purposes in 2009. Before 2009, § 2B1.1 defined a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n. 1. Subsection (b)(1) referred only to monetary harm, and the application notes explained that the "actual loss" was required to be "pecuniary harm . . . that is monetary or that is otherwise readily measurable in money." *Id.* at cmt. n. 3(A)(i), (iii). The guideline amendments effective in November 2009, however, expanded the definition of "victim" in "cases involving means of identification" to include individuals who suffered pecuniary harm *or* "any individual whose means of identification was used unlawfully or without authority." *Id.* at cmt. n.4(E) (2009). Because the court sentenced Sandoval using the November 2009 guidelines manual, it included in the count of victims both the 40 stores and credit card companies that sustained actual loss as well as the 65 victims whose credit cards were used, regardless of monetary loss.

Sandoval acknowledged at sentencing that under the 2009 guidelines she qualified for the 4-level increase applicable to crimes involving 50 or more victims. But

she maintained that the district court should disregard the guideline amendment because there was no evidence that cardholders were actually harmed or expended significant time or effort cancelling their credit cards. Thus, she reasoned, applying § 2B1.1(b)(2) as amended resulted in a sentence that was greater than necessary under 18 U.S.C. § 3553(a). The district court rejected Sandoval's arguments and concluded that she did "deserve a guideline sentence."

Assuming the district court did not commit a procedural error, we apply the familiar abuse-of-discretion standard to determine if its sentencing decision was reasonable. *See Gall v. United States*, 552 U.S. 38, 46 (2007); *Rita v. United States*, 551 U.S. 338, 363-65 (2007) (Stevens, J., concurring). Procedural errors include failing to calculate or incorrectly calculating the guideline range, treating the guidelines as mandatory, failing to consider the § 3553(a) factors, or failing to satisfactorily explain the given sentence. *Gall*, 552 U.S. at 51. Absent any procedural error, a sentence within a properly calculated guideline range is entitled to a rebuttable presumption of reasonableness. *Rita*, 551 U.S. at 341-49. We review the district court's interpretation of the sentencing guidelines *de novo*. *United States v. Aslan*, 644 F.3d 526, 531 (7th Cir. 2011).

Perhaps in an attempt to avoid the presumption of reasonableness that would otherwise attach to Sandoval's sentence, she argues that the district court committed a procedural error by treating the guidelines as mandatory. Specifically, she claims that the judge

misunderstood his authority to disagree with the policy rationale behind the amended § 2B1.1(b)(2). Citing *Kimbrough*, Sandoval emphasizes the district court's authority to deviate from the guidelines on policy grounds, including disagreement with the guidelines. *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007) (district court does not abuse discretion by concluding that guidelines' crack/powder disparity yields "greater than necessary" sentence under § 3553(a)).

Sandoval's argument falls flat because it is clear from the transcript that the district court fully understood its authority but simply chose not to exercise it. Rightly so. The change to § 2B1.1 is unlike the crack/powder disparity the Court highlighted in *Kimbrough*. As *Kimbrough* itself explains, the Sentencing Commission failed to account for "'empirical data and national experience'" when formulating the crack cocaine guidelines. *Id.* at 109 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007)). And the Commission itself recognized that the crack/powder disparity produced disproportionately harsh sentences for crack offenders. *Kimbrough*, 552 U.S. at 110.

In amending the application note to § 2B1.1, the Commission sought to account for the impact identity theft type crimes have on cardholders who may not have actually lost money. The Commission explained that such an individual "even if fully reimbursed, must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guide-

lines." U.S.S.G. app. C supp., Amend. 726 (2009). This explanation undoubtedly describes the cardholder victims here. Despite this, Sandoval insists that the government failed to present evidence that the cardholders were inconvenienced by her fraud. From this she posits that the revised guideline is inapplicable to her crime, and that the district court should have thus disregarded it on policy grounds. She also cites a number of cases predating the revised definition to support her position that a victim must occasion financial loss or some quantifiable inconvenience. For obvious reasons, the cases predating the change are inapplicable here. And we reject, as the district court did, Sandoval's assertion that her victims were not sufficiently inconvenienced by the process of replacing the cards that were compromised by her fraud.

Nothing in the sentencing transcript supports Sandoval's assertion that the court felt bound by the expanded definition of "victim." The court listened to Sandoval's argument that the Sentencing Commission ignored certain Federal Trade Commission studies when it expanded the definition of victim. Sandoval argued that the studies did not support the view that an individual whose loss was fully reimbursed by the credit card company must nonetheless spend significant time cancelling credit cards and resolving credit problems. After hearing her position, the court responded that it was not "a reasonable result" to excuse Sandoval from responsibility because "either through the vigilance of the card holder or the vigilance of the store or the vigilance of the credit card company[,]

she's thwarted" in her attempt to fraudulently use some-
one else's credit card information. The court also pointed
out that Sandoval's sort of fraud "undermines the very
existence" of the "credit economy" in which we now
operate. Finally, the court explicitly rejected Sandoval's
citation to cases relying on the earlier version of § 2B1.1,
noting that there was "no indication that the [courts]
would reach the same result under the new guideline."
Given the court's discussion at sentencing, it is clear
that it understood Sandoval's argument and also under-
stood that if it disagreed with the basis for the ex-
panded definition of victim, it had the authority to
deviate from the range prescribed by that guideline.
*See United States v. Allday*, 542 F.3d 571, 574 (7th Cir. 2009)
(fact that judge concludes after argument that ad-
visory range is reasonable "in no way demonstrates that
the court erroneously *presumed* the range reasonable")
(emphasis in original); *see also United States v. Curb*, 626
F.3d 921, 927-28 (7th Cir. 2010) ("A district judge's rea-
soned agreement with an advisory sentencing guideline
will not be deemed unreasonable on appeal."). It simply
chose not to. The court did, however, sentence Sandoval
at the low end of the guideline range in recognition of
the recent change to the guidelines, stating, "[B]ecause
of the change in the guidelines, I'm going to give you
some credit for that, but I think you do deserve a guide-
line sentence in this case."

   In sum, the court considered and ultimately rejected
Sandoval's argument that the amended § 2B1.1 should
not apply to her crime. Given the evidence in the

record that the 65 individuals whose credit card numbers she used each had to spend time talking to his or her respective credit card issuer to verify the fraudulent charges, reverse the charges, and close and reissue the card, it was certainly reasonable for the court to conclude that those individuals were "victims" within the meaning of amended § 2B1.1. And nothing else about Sandoval's ultimate sentence at the low end of the properly calculated guideline range is unreasonable. *See United States v. Moreno-Padilla*, 602 F.3d 802, 812-13 (7th Cir. 2010) (court is never required to deviate from guidelines on policy grounds).

That leaves Sandoval's claim that applying § 2B1.1 as amended violated the ex post facto clause of the Constitution. We held in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), that because the guidelines are advisory, changes that retroactively increase the sentencing range for a crime are not ex post facto laws. Despite disagreement from other circuits, *see United States v. Wetherald*, 636 F.3d 1315, 1321 (11th Cir. 2011)*; United States v. Ortiz,* 621 F.3d 82, 87 (2d Cir. 2010); *United States v. Turner*, 548 F.3d 1094, 1099-1100 (D.C. Cir. 2008), we have consistently upheld *Demaree, see, e.g., United States v. Robertson*, 2011 WL 5555865, at *3 (7th Cir. Nov. 16, 2011). Sandoval presents no new arguments to convince us that we should reverse course on this issue now. Accordingly, we affirm Sandoval's convictions and sentences.

**B.**

Sean Vanderhack's role in the scheme was to intercept the merchandise upon delivery. He would arrive at a predetermined drop-off location—sometimes residential locations and sometimes hotels—and take the packages. One of his pick-up locations was the home of Susan and Walter Schweiger. Sandoval ordered $5,000 worth of merchandise from Saks Fifth Avenue using Susan Schweiger's credit card, but Saks had suspected something and contacted the Schweigers before delivering the package. Although Saks stopped delivery on the package, the Schweigers devised their own plan to catch the perpetrator (Saks had declined their offer to receive the package in an attempt to bait the thieves). After putting a decoy box on their front porch, the Schweigers spotted Vanderhack, who walked by the house twice and looked at the package while talking on a cell phone.

Both Susan and Walter Schweiger detailed their encounter at Vanderhack's bench trial. After Susan testified but before Walter's testimony, Vanderhack approached the Schweigers in the courthouse hallway and attempted to justify his presence in their neighborhood. He said he was there to meet a friend and told them that stealing packages from porches was not his "thing." Susan later reported feeling intimidated during the exchange by Vanderhack's size and stance. Walter, however, was unmoved by Vanderhack's story: he called Vanderhack a liar and proceeded to testify as planned.

Vanderhack was convicted of one count of conspiracy to commit access device fraud, 18 U.S.C. § 1029(b)(2),

and one count of theft of goods transported in interstate commerce, *id.* § 659. The district court sentenced him to concurrent sentences of 21 months' imprisonment on the two counts. Based on the hallway exchange with the Schweigers, Vanderhack's guideline range included a two-level increase for obstruction of justice. *See* U.S.S.G. § 3C1.1. We review the adequacy of the district court's obstruction findings de novo and any underlying factual findings for clear error. *United States v. Price*, 516 F.3d 597, 606-07 (7th Cir. 2008).

Vanderhack argues on appeal that although his exchange with the Schweigers was "just plain stupid," it was not obstructive conduct as contemplated by § 3C1.1. Section 3C1.1 applies when a defendant willfully attempts to obstruct justice with obstructive conduct relating to the offense of conviction. The application notes explain that obstructive conduct includes "threatening, intimidating, or otherwise unlawfully influencing" a witness or "attempting to do so." U.S.S.G. § 3C1.1 cmt. n. 4(a). The 2-point adjustment is warranted whether or not a defendant's attempt to obstruct justice succeeds. *United States v. Strode*, 552 F.3d 630, 635 (7th Cir. 2009).

We agree with Vanderhack that his conduct was indeed "stupid," but the district court was correct to conclude that it was also obstructive. Vanderhack suggests that his comments to the Schweigers do not evince the requisite specific intent to influence their testimony. *See United States v. Martinez*, 650 F.3d 667, 670 (7th Cir. 2011) ("[W]e have interpreted § 3C1.1's use of the word "willfully" to

require a specific intent to obstruct justice."). He relies on the fact that Susan Schweiger had already testified and that after their encounter Walter testified as previously planned. But the fact that Walter did not feel intimidated by Vanderhack and went forward with his testimony does not undercut the possibility that Vanderhack wanted to influence his testimony. Although Vanderhack characterizes his comments standing alone as innocuous, the statements must be considered in context. Frankly, if not to influence Walter's testimony, it is difficult to imagine what other reason Vanderhack would have for approaching the Schweigers outside of the courtroom directly before Walter's testimony and trying to explain away his presence in their neighborhood. Indeed, other than "stupidity," Vanderhack himself fails to offer a plausible non-obstructive motive for his encounter. Given the facts, the district court certainly did not err by concluding that Vanderhack approached the Schweigers with the specific intent to influence Walter's testimony against him. The 2-level adjustment under § 3C1.1 was therefore warranted. *See United States v. House*, 551 F.3d 694, 699 (7th Cir. 2009) ("The bare attempt to persuade a witness not to offer otherwise truthful testimony would indeed be an attempt to unlawfully influence the outcome of the proceeding.").

## C.

That leaves April Hicks. She acted as a lookout for others stealing clientele books and also helped pick up the packages of fraudulently ordered merchandise. Hicks

entered a plea declaration to one count of participating in a scheme to defraud. *See* 18 U.S.C. § 1342. (Hicks pleaded guilty before the government filed its superseding indictment changing the § 1342 charge to a conspiracy charge under § 1029(a)(2).) Before sentencing, Hicks cooperated with government agents in their investigation against her co-schemers. She contacted the agents to tip them off to a call she received from Sandoval directing her to travel to Highland Park, Illinois, with Vanderhack to pick up a package. She also wore a wire and recorded several conversations with Sandoval that were played at Vanderhack's trial. Finally, she testified before the grand jury and also at Vanderhack's trial. In light of her cooperation with the government, the court sentenced her to 40 months' imprisonment—a sentence well under the 57-71 month range dictated by her offense level of 18 and significantly, her criminal history category VI.[2]

Hicks argues on appeal that when selecting her sentence the district court failed to fully account for her personal circumstances and overemphasized what she claims was an inflated criminal history category. Hicks's extensive criminal history consisted of a steady string of retail theft and other convictions that she received for the most part prior to 2002—during the years when

---

[2] The court also took into account the fact that if Hicks had pleaded guilty after the government's theory of the offense changed from a scheme to a conspiracy, she would have had an offense level of 17 instead of 18.

she was regularly using heroin. At sentencing, she argued that she had reformed dramatically in recent years. Beginning in August 2007, she had become and remained drug free. She had also attended college while caring singlehandedly for her two young children. The court also heard from Hicks's employer, a quadriplegic who attested via letter to her trustworthiness and commitment and dedication to her children. And she maintained that other defendants with lesser roles than she had received shorter sentences. Finally, she emphasized her cooperation and the extraordinary needs of her children, who would be left with no one to care for them if she was imprisoned. In light of all this, Hicks asserts that in fashioning its sentence the district court focused on her extensive criminal history to the exclusion of the other salient § 3553(a) factors—essentially elevating the criminal history guideline to mandatory status.

Given her below-guidelines sentence, Hicks faces an uphill battle on appeal. *See United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009) ("We have expressed skepticism about defense arguments that a below-guidelines sentence is unreasonable."). Unfortunately, her arguments fall short of demonstrating either that the court treated the guidelines as mandatory or that it failed to consider the applicable § 3553(a) factors. Indeed, the transcript reveals that the court entertained and responded to each of Hicks's arguments. As for the age of her convictions, the court pointed out that the criminal history calculation did not include her numerous convictions outside the 10-year range prescribed by the guidelines. In rejecting Hicks's argument that the

convictions before 2002 were "too old," the court stated its belief that the 10-year line drawn by the guidelines adequately accounted for old convictions. *See* § 4A1.2(e) (excluding prior convictions more than 10 years old that resulted in a sentence of under one year imprisonment). The court also expressed doubt that Hicks's drug addiction was entirely to blame for her numerous theft convictions, stating that it was not particularly persuasive that "these [convictions] are simply old and that intermittently she stopped using drugs and then went back and the crimes started again." And the court did account for her cooperation by sentencing her below the guidelines range. The court also acknowledged the difficult situation Hicks faced with her children, pointing out that "the impact on families when defendants are sent to prison" was "sinful." Nonetheless, the court concluded that it should not be asked to "bail her out of the consequences of her own actions," pointedly referring to "the old saying if you can't do the time, don't do the crime." The court noted that short of giving a "get out of jail free card to single parents," the "terrible circumstance" occasioned by imprisoning a child's only parent could not be avoided.

Moreover, after listening and responding to Hicks's arguments, the court continued the sentencing for two days in order to think about her arguments before imposing a sentence. When it pronounced its sentence, the court explained that it had attempted to fashion a sentence that would be minimally disruptive for the children, but had concluded that a "serious" sentence was necessary "under the circumstances." The court also

extensively considered Hicks's claim that her recent reforms should override her criminal history. Ultimately though, the court determined that it should not "relieve" Hicks of "the consequences of prior criminal behavior." Contrary to Hicks's assertions, the court's unwillingness to disregard her past does not demonstrate that it failed to consider her as an individual as required under § 3553(a). Indeed, there is every indication from the transcript that the court considered Hicks's personal history and circumstances when fashioning the sentence it believed best served the goals of § 3553(a). There is also no evidence that the court treated the guideline range as mandatory, particularly given that the court ultimately imposed a sentence 17 months below the advisory guideline range.

Nor did the court ignore Hicks's sentencing disparity arguments. Hicks pointed out at sentencing that codefendant Kia Wright received only a 24-month sentence, despite what Hicks claimed was a larger role in the scheme. However, as the district court recognized, the discrepancy is easily explained by the fact that Wright had no criminal history points compared to Hicks's 20 points—a Category I versus a Category VI for sentencing purposes. In any event, Hicks's argument does not get off the ground given our refusal to entertain sentencing challenges based on disparities between codefendants' sentences. *See United States v. Omole*, 523 F.3d 691, 700 (7th Cir. 2008) ("[T]his court refuses to review the discrepancy between sentences of codefendants as a basis for challenging a sentence."). In sum, the record reveals that the court considered all

of Hicks's arguments and arrived at the sentence it believed best served the goals of § 3553(a). Although the court could have chosen to overlook Hicks's past criminal behavior in light of her recent positive changes, it was certainly not unreasonable for it to reject such an outcome. *See United States v. Moreno-Padilla*, 602 F.3d 802, 814 (7th Cir. 2010) ("[T]he decision to follow the Sentencing Guidelines is within the court's discretion just as the decision to reject them is.").

## II.

For the foregoing reasons, we AFFIRM the judgments of the district court in all respects.