In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3884

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TAJUDEEN RABIU,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 365-2 — **Ronald A. Guzmán**, *Judge.*

ARGUED JUNE 13, 2013 — DECIDED AUGUST 1, 2013

Before MANION, SYKES, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* Tajudeen Rabiu pleaded guilty to
bank fraud, 18 U.S.C. § 1344, and aggravated identity theft, *id.*
§ 1028A(a)(1). The district court calculated a total offense level
of 26, which includes a four-level upward adjustment based on

a finding that the offense involved fifty or more "victims." *See* U.S.S.G. § 2B1.1(b)(2)(B) (2010). The crimes were committed between 2003 and 2007, but the court applied the 2010 version of the sentencing guidelines, which for fraud offenses expands the definition of "victim" to include not only persons who incurred actual pecuniary loss but also "any individual whose means of identification was *used* unlawfully or without authority." *See id.* § 2B1.1 cmt. n.4(E) (emphasis added). The number of victims, if based entirely on actual pecuniary loss, would have been at least ten but not fifty, so under the version of the guidelines in effect when Rabiu committed his crimes, the upward adjustment for the number of victims would have been two levels, not four. *See* U.S.S.G. § 2B1.1(b)(2)(A) (2006). Rabiu thus argues that applying the 2010 guidelines violated the Ex Post Facto Clause and, alternatively, that the district court misinterpreted the expanded definition of "victim" in linking him to at least fifty victims. Although we agree with Rabiu that the court overstated the number of victims, it is clear that the district judge would have imposed the same sentence even had he accepted Rabiu's calculation of the imprisonment range. Accordingly, the error was harmless.

## **I.** Facts

Rabiu was indicted for bank fraud, unauthorized use of access devices, and aggravated identity theft. *See* 18 U.S.C. §§ 1344, 1029(a)(2), 1028A(a)(1). According to the indictment, Rabiu had worked as a teller at three different banks between September 2003 and February 2007. Without authorization, he searched account records looking for account holders with balances exceeding $100,000. He then stole their identifying

information and, along with his codefendants, compromised some of that information to divert checks and money into fraudulently opened bank accounts. Postal inspectors who were investigating Rabiu lawfully searched his home and seized handwritten notes containing the name, Social Security number, and account information of eighty-six customers from the banks where he had worked, as well as an unspecified number of fake driver's licenses and Social Security cards bearing the names of some of those customers. Apparently only seventeen of those account holders suffered pecuniary loss, and those losses eventually were reimbursed by the banks.

Rabiu was arrested in April 2009. After a codefendant pleaded guilty and agreed to cooperate against him, Rabiu pleaded guilty to one count each of bank fraud and aggravated identity theft. He submitted a plea declaration admitting participation in the scheme, but insisting that some of the names and identifying information used on the phony driver's licenses and Social Security cards were fictitious and not from bank customers. Rabiu's plea declaration does not include any admission concerning the number of customers whose information he stole or used.

Before sentencing, the government asserted that Rabiu should receive a four-level upward adjustment under § 2B1.1(b)(2)(B) because, according to the government, the bank fraud had "involved 50 or more victims." The government cited the current definition of "victim," which, for offenses involving identity theft, was broadened in November 2009 (after Rabiu's arrest). *See* U.S.S.G. supplement to app. C (2009) (amendment 726). The expanded definition, found in

Application Note 4(E) to § 2B1.1, includes not only persons who suffered actual injury but also those "whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E)(ii) (2010). Rabiu countered that, because he was charged with crimes that had ended in 2007, applying this broader definition of "victim" was an ex post facto violation (though he acknowledged this court's decision to the contrary, *see United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006)). He urged the district court to use the narrower definition of "victim" in effect when the crimes were committed. Rabiu alternatively argued that, even under the broader definition, the number of victims is less than 50 because the evidence proved not that he had "used" their identifying information, but only that he had stolen or possessed the information.

At sentencing the parties debated the meaning of "used" in Application Note 4(E). For a person to count as his victim, Rabiu maintained, the government had to prove that he actively employed that person's identifying information in connection with the bank fraud; simply writing down and concealing their identifying information, he insisted, showed only that he stole or possessed the information. Under the broadened definition of "victim," he argued, he was responsible for only thirty-three victims, not for all eighty-six whose identifying information was found in his home. The government insisted, however, that Rabiu had "used" the account holders' identifying information simply by writing it down and taking it to his apartment (and thus making each account holder a "victim").

The district court agreed with the government, reasoning that the bank customers became "victims" when Rabiu "took their information—their private, personal identity information—from the bank to his home and proceeded to attempt to utilize it in the execution of his ongoing scheme." (The court's assertion that Rabiu had made an "attempt to utilize" the stolen information is an overstatement; as far as the record shows, only a few of the eighty-six names and associated identifying information appear on phony documents.) The court accordingly added four levels (not two, as the probation officer had recommended, for 10 or more victims, *see* U.S.S.G. § 2B1.1(b)(2)(A)), and calculated a total offense level of 26. Rabiu's criminal-history category is I, so he faced an imprisonment range of 63 – 78 months. The court did not address Rabiu's ex post facto argument but did discuss the factors underlying its sentencing decision, including the seriousness of the crimes and the need to protect the public from Rabiu and deter him and others from future crimes, *see* 18 U.S.C. § 3553(a). Just before pronouncing the sentence, the court stated: "Frankly, regardless of what any other court in the future may rule that the appropriate offense level and guideline calculation was, I feel the sentence I'm about to impose is appropriate in this case for the reasons that I've stated here today." The court then imposed total imprisonment of 102 months: 78 months for bank fraud and 24 months consecutive for aggravated identity theft.

## II. Discussion

On appeal Rabiu maintains that the district court's use of the 2010 guidelines, rather than a version without the expanded definition of "victim," violated the Ex Post Facto

Clause. We held in *Demaree*, 459 F.3d at 795, that using the current version of the guidelines does not raise an ex post facto concern even if the result is a greater imprisonment range for the charged offense. Shortly before oral argument, however, the Supreme Court rejected our stance and held that the Ex Post Facto Clause is violated when a defendant is sentenced under a version of the guidelines promulgated after he committed his crime if the newer version yields a higher sentencing range. *Peugh v. United States*, 133 S. Ct. 2072, 2084 (2013). That decision supports Rabiu's argument that his guidelines range is overstated; he should have received a two-level increase (rather than four levels) for the number of victims, and his guidelines range should have been 51 – 63 months.

The *Peugh* decision also instructs, however, that a misapplication of a new guideline will be deemed harmless if the sentencing court also stated on the record that the identical sentence would have been imposed if the court followed the older, more lenient version. *See Peugh*, 133 S. Ct. at 2088 n.8. Many times we have found that message to insulate a sentencing judge's misapplication of a sentencing statute or guideline. *See, e.g.*, *United States v. Foster*, 701 F.3d 1142, 1157–58 (7th Cir. 2012) (concluding that error in failing to apply Fair Sentencing Act was harmless where district judge stated he would impose identical sentence "applying the FSA or not"); *United States v. Hill*, 645 F.3d 900, 912–13 (7th Cir. 2011) (explaining that purported sentencing error would have been harmless based on district judge's statement that the sentence would be the same "if there were no guidelines"); *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009) (concluding that application of

upward adjustment was harmless error because district judge said she would have given same sentence without adjustment); *United States v. Anderson*, 517 F.3d 953, 965–66 (7th Cir. 2008) (same where district judge stated he would impose identical sentence "if another judge determines that my sentencing guidelines calculations were in any way made in error").

Before imposing the sentence, the district court discussed the pertinent factors in 18 U.S.C. § 3553(a) and explained that those factors warrant the punishment imposed even if the court's application of the guidelines is determined to be erroneous. That statement dismantles Rabiu's contention that the misapplication of the new version of § 2B1.1(b)(2)(B) could have been harmful. We recognize that an unforeseen change in the guidelines may weaken the force of an opinion like the judge gave in this case, *see, e.g.*, *United States v. Gokey*, 437 F.3d 622, 626 (7th Cir. 2006); *United States v. Graves*, 418 F.3d 739, 746 (7th Cir. 2005), but here the judge's unambiguous statement contemplated the position of each party and the associated guidelines range. The district court fully understood the disputed issue yet signaled that Rabiu will not receive a lower sentence on remand even if we accept his argument that he victimized fewer than fifty people. As was the case in *Foster* and in the other cases cited, the district court's statement "was not just a conclusory comment tossed in for good measure." *Foster*, 701 F.3d at 1158 (internal quotation marks omitted). Rather, the district court here emphasized in detail the seriousness of the crime, the dismissive attitude of the defendant, and the need for deterrence. Thus, despite *Peugh*'s support for Rabiu's ex post facto claim, the overstatement of his guidelines range was harmless and his sentence stands.

Although *Peugh* and our harmless-error jurisprudence dispose of this case, we think it prudent to decide the underlying issue addressed by the parties. We have not yet parsed the phrase "used unlawfully or without authorization," U.S.S.G. § 2B1.1 cmt. n.4(E), and we think it best to settle the meaning now because the question is sure to arise again soon. Our starting point is the text of Application Note 4(E) and the plain meaning of the words used. *See United States v. Mount*, 675 F.3d 1052, 1054 (7th Cir. 2012); *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005). Application notes are considered part of the guidelines rather than commentary on the guidelines. *Stinson v. United States*, 508 U.S. 36, 38 (1993); *Arnaout*, 431 F.3d at 1001.

Section 2B1.1(b)(2) provides for a two-level increase if the offense "involved 10 or more victims" and a four-level increase if there are "50 or more victims." Application Note 4(E), as it appears after the 2009 amendment, defines a "victim" as "(i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority." The definition found in Application Note 1 (which has remained unchanged since 2003) reads: "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." Together these two application notes describe distinct categories of "victim" for fraud offenses involving identity theft: those who sustain pecuniary loss or bodily injury (whether or not their identifying information was used) and those whose identifying information was "used" though they suffered no loss or injury. At oral argument both parties asserted that no account holder

suffered actual pecuniary loss because all of them were made whole by the financial institutions. But that shared contention rests on an incorrect legal premise. Account holders whose funds are depleted *incur* actual pecuniary loss even if later reimbursed, and so they count as "victims" for purposes of § 2B1.1(b)(2), even under the definition of victim that governed when Rabiu committed his crimes. *See United States v. Loffredi*, No. 12-1124, slip op. at 4–5 (7th Cir. June 18, 2013) (Both the party who suffered the initial loss and the party who reimbursed the loss have been harmed. The party reimbursed does not reduce the number harmed.). Rabiu has never disputed that the accounts of at least seventeen of his customers were compromised temporarily, so the number of "victims" cannot be fewer than that number. The question we confront here is, what constitutes "use" of someone's identifying information?

Only three times have we reviewed in a published opinion an application of § 2B1.1(b)(2) using the broadened definition of "victim," and in none of those decisions did we address the definition of "used" in Application Note 4(E)(ii). *See United States v. Harris*, No. 12-1470, slip op. at 7–9 (7th Cir. May 29, 2013); *United States v. Vasquez*, 673 F.3d 680, 687 (7th Cir. 2012); *United States v. Sandoval*, 668 F.3d 865, 867–69 (7th Cir. 2011). The Eleventh Circuit recently held, however, that a victim of identity theft is a "victim" under the broader definition of Application Note 4(E)(ii) only if the person's identifying information was actively employed to further the purpose of the conspiracy or scheme. *United States v. Hall*, 704 F.3d 1317, 1322–23 (11th Cir. 2013). The defendant in that case, a medical office assistant, stole identifying information from at least 65 patients and sent that information to her cohorts, who obtained

fraudulent credit cards in the names of twelve of those persons. *Id.* at 1319–20. Hall pleaded guilty to conspiracy to commit bank fraud, 18 U.S.C. §§ 1349, 1344, and at sentencing received a four-level upward adjustment under § 2B1.1(b)(2)(B) because, according to the district court, the scheme had involved fifty or more victims. *Hall*, 704 F.3d at 1320. In rejecting that conclusion, the court of appeals held that the number of victims was just twelve. *Id.* at 1323. The court began with the literal reading of Application Note 4(E) and plain meaning of "use," which, the court described, is the "'application or employment of something … for the purpose for which it is adapted.'" *Id.* at 1322 (quoting *Black's Law Dictionary* 1681 (9th ed. 2009)). Hall had employed (or "used") the identifying information of her patients for the purpose of obtaining cash by way of the fraudulent credit cards. *Id.* The court also pointed to the language in § 2B1.1(b)(10) (now (b)(11)), which adds two levels based on different behaviors involved in the offense. *Id.* That section reads:

> If the offense involved (A) the *possession or use* of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized *transfer or use* of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) *the possession* of 5 or more means of identification that unlawfully were produced from, or obtained *by the use of*, another means of identification, increase by 2 levels.

U.S.S.G. § 2B1.1(b)(10) (2010) (emphasis added). The court noted that the terms "use" and "transfer" (and also "possession") in that section are joined by the conjunction "or"; this means, the court reasoned, that the Sentencing Commission intended different definitions for each word. *Hall*, 704 F.3d at 1322. The court concluded that "use" must mean more than a transfer of identifying information "without more action," and that additional action did not occur until Hall's coconspirators applied for ("used" the identifying information to obtain) the twelve fraudulent credit cards. *Id.* Thus, Hall's theft, sale, and transfer of the information did not equate to "using" the information. *Id.* at 1323.

The analysis in *Hall*, which was decided after Rabiu was sentenced, mirrors the Supreme Court's rationale in *Bailey v. United States*, 516 U.S. 137, 149 (1995), which concluded that constructively possessing a gun in a "nonactive nature" is distinct from "using" or "carrying" it. A former version of 18 U.S.C. § 924(c) mandated a five-year prison term for a defendant who "during and in relation to any crime of violence or drug trafficking crime … uses or carries a firearm." 18 U.S.C. § 924(c)(1) (1984). The Court reversed the judgment of the D.C. Circuit, which had equated "use" with "possession," rendering meaningless "carry" as written in the statute. *Bailey*, 516 U.S. at 150. (Congress later amended § 924(c)(1) so that it now proscribes possession as well as using or carrying.) As the Court explained, "use" does not mean to possess, but rather means "'[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of,'" definitions which "imply action and implementation." *Id.* at 145.

The sentencing guidelines also distinguish between terms in many other provisions, signaling the intent of the Sentencing Commission to target separate behaviors. *See, e.g.*, U.S.S.G. §§ 2A2.2(b)(2) (adding upward adjustment of five levels if firearm is discharged but only three levels if weapon is "brandished or its use was threatened"), 2K1.3(b)(3) (providing upward adjustment if defendant "used or possessed" explosive material or believed "it would be used or possessed"), 2K2.6 & cmt. n.1(C) (providing base offense level of 10 for possessing, purchasing, or owning body armor, but requiring four-level upward adjustment if body armor is "used in connection with another felony"), 2L2.2(b)(3) (adjusting upward if defendant fraudulently "obtained or used" a passport). And the guidelines' definition of "use" in other contexts confirms that some action more than acquiring or possessing is required. *See id.* §§ 1B1.1 cmt. n.1(I) (defining "otherwise used" in reference to dangerous weapons as conduct that "did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing"), 2K2.6 cmt. n.1(C) (defining "use" of body armor to include wearing for protection or as barter but excluding from definition armor that was "merely possessed"), 3B1.5 cmt. n.1 (same and explaining that "'use' does not mean that the body armor was found in the trunk of the car but not used actively as protection").

Turning back to Rabiu, the government's evidence shows that he possessed identifying information for at least fifty persons but "used" the information of fewer than fifty. (Rabiu puts the number of persons whose identifying information was "used" at thirty-three; the government makes no effort to challenge that number.) The government argued that persons

whose identifying information Rabiu stole became "victims" the minute he wrote down the information and took it to his apartment. But the plain language of the application note and the reasoning of *Hall* compel the conclusion that Rabiu only had *possessed* the information at that point; he had not actively *used* it for any purpose. *See Hall*, 704 F.3d at 1322–23 & n.3. Because his possession of the information was not "use," the offense did not involve at least fifty victims. If the number was thirty-three, as Rabiu concedes, then under the current version of § 2B1.1(b)(2) he should have received a two-level (rather than four-level) upward adjustment. *See* U.S.S.G. § 2B1.1(b)(2). If everything else remained constant, Rabiu's total offense level would be 24, and his imprisonment range would be 51 – 63 months, rather than 63 – 78 months. But because the district court noted it would have given the same sentence despite its error, Rabiu cannot prevail on this argument either.

### III. Conclusion

Although Rabiu has support for both of his arguments on appeal, the district court's statement during sentencing renders its errors harmless. Accordingly, we AFFIRM the judgment of the district court.