In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2224

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OLUSOLA AROJOJOYE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 365 — **Ronald A. Guzmán**, *Judge.*

ARGUED APRIL 17, 2014 — DECIDED JUNE 3, 2014

Before MANION, SYKES, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* Olusola Arojojoye participated in a
multi-faceted fraudulent check-cashing operation involving his
creation of fraudulent documents bearing the identities of
people and fictitious businesses. After he was caught in the act,
he was indicted by a grand jury on a dozen counts related to
fraud. He ultimately pleaded guilty to one count of bank fraud
in violation of 18 U.S.C. § 1344 and one count of aggravated
identify theft in violation of 18 U.S.C. § 1028A(a)(1). The

district court imposed a below-Guidelines sentence of 85 months' imprisonment on the bank fraud count and 24 months on the identity theft count, to be served consecutively for a total sentence of 109 months. On appeal, Arojojoye challenges his aggravated identity theft conviction and sentence. We affirm.

## I. Facts

From January 2005 to May 2008, Arojojoye and seven co-defendants engaged in an identity theft and bank fraud operation that resulted in over a million dollars in losses to financial institutions and adversely impacted the people whose identities were stolen. To implement this operation, Arojojoye surreptitiously acquired vital information, including social security numbers, and manufactured false identification documents and created fictitious businesses. With these fraudulent documents, he opened mailboxes at commercial mail-receiving agencies. He then recruited co-defendants Kenneth Kormoi and Quintin Henderson to do the same. He also opened fraudulent merchant credit card accounts and bank accounts, and completed fraudulent transactions. To perpetuate the scheme, he bought valid credit card numbers from internet hackers and ran up fraudulent charges through these merchant accounts through credit card processing machines provided to him on the mistaken belief that he was operating legitimate businesses. In order to receive these payments (delivered to the fraudulently procured mailboxes) from the credit card companies who had provided him the machines, he was required to produce proof that his "businesses" provided goods or services, and so he created false invoices.

Another facet of this operation involved the theft of convenience checks—checks issued by credit card companies to their customers that disburse funds drawn from the customer's line of credit. Finally, the operation also involved the theft of actual checks. One of Arojojoye's co-defendants, who was gainfully employed by Navistar Financial Services Corporation, stole two checks payable to the Navistar Leasing Company in the total amount of $441,889.03. With the aid of the fraudulent documents created by Arojojoye, these real checks were negotiated through a fraudulently created account.

This criminal enterprise continued for over three years until Arojojoye was finally arrested after presenting a stolen credit card and fraudulent driver's license to purchase money orders and prepaid phone cards at a Wal-Mart in Illinois. An inventory search of his Mercedes produced voluminous evidence of fraud and identity theft. Law enforcement authorities eventually discovered that the scheme involved the creation of over fifteen fictitious businesses, caused the theft of dozens of personal identities, and resulted in substantial pecuniary loss to a number of financial institutions.

### A. Procedural History

On July 9, 2009, a grand jury returned a forty-two-count indictment against Arojojoye and seven co-defendants. On April 4, 2011, Arojojoye pleaded guilty to one count of bank fraud under 18 U.S.C. § 1344 and to one count of aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1). The remaining charges were dismissed pursuant to the plea agreement.

In connection with his guilty plea, Arojojoye submitted a Plea Declaration whereby he acknowledged that he understood the charges and that the facts "establish[ed] his guilt beyond a reasonable doubt." The Plea Declaration contained admissions that Arojojoye "participated in activities to defraud using fake IDs, bank accounts, merchant accounts, stolen identities and credit card numbers." He also admitted that he created fraudulent documents for use by himself and others by getting names and information from the internet and by using computer applications to produce fraudulent business documents. He further admitted to paying co-defendants Henderson and Kormoi to open fraudulent mailboxes and to engage in other aspects of the conspiracy.

Following entry of his guilty plea, the Probation Office prepared a Presentence Investigation Report ("PSR"). Using the November 2010 edition of the Sentencing Guidelines Manual, the Probation Office determined that Arojojoye's base offense level was 29 and that his criminal history placed him in category II. This resulted in an advisory guideline range of 97–121 months' imprisonment in connection with Count 20, the bank fraud conviction. Additionally, Count 36, the aggravated identity theft count, carried a mandatory two-year term of imprisonment that must be served consecutive to any other term of imprisonment imposed. 18 U.S.C. § 1028A(a)(1), (b)(2).

The Probation Officer's calculation of Arojojoye's total offense level included: a sixteen-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), based on a loss amount of $1,028,818; a four-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(B), because the scheme involved at least 50 victims who had their means of identification used unlawfully and without authority;

a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(9)(C), because the offense involved sophisticated means; and a three-level increase, pursuant to U.S.S.G. § 3B1.1(b), because Arojojoye was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. The Probation Officer also recommended a three-level reduction in offense level, pursuant to U.S.S.G. § 3E1.1(a) and (b), because Arojojoye accepted responsibility and pleaded guilty without delay. In submissions filed prior to sentencing, Arojojoye objected to every increase to the offense level except the enhancement for sophisticated means.[1]

### B. Sentencing Proceedings

The parties disputed various aspects of the PSR's calculations. Due to the voluminous nature of the incriminating evidence, the district court held four sentencing hearings to address these disputes.

### i. September 21, 2012, Sentencing Hearing

At his first sentencing hearing on September 21, 2012, the government sought to hold Arojojoye accountable for actual losses resulting from fraudulent transactions that he personally conducted. But the government also sought to hold Arojojoye responsible for actual losses resulting from fraud committed by co-schemers with the assistance of the fraudulent documents he created—or fraudulent mailboxes or addresses he opened

---

[1] Indeed, Arojojoye expressly agreed to application of the enhancement for sophisticated means by including the enhancement in his own guideline calculation submitted to the court, wherein he specifically stated that this enhancement was "not contested."

or shared. These combined losses totaled over $1 million. In support of that loss amount, the government introduced exhibits evidencing the amount of the loss, as well as Arojojoye's connection to each loss. These exhibits included items (such as computer equipment) seized from his Mercedes following his arrest. Also, an affidavit from the case agent attesting to the accuracy of the information contained in the agent's report totaled over 70 pages and detailed the items gathered. The government submitted an itemized spreadsheet listing, by individual victim and financial institution, the actual loss amount as a result of the fraud. The agent submitted his own commentary noting the evidence connecting Arojojoye to each loss amount. On Arojojoye's motion, he was granted a continuance to rebut the government's loss calculation.

### ii. November 7, 2012, Sentencing Hearing

At the November 7, 2012, sentencing hearing, Arojojoye disputed that the $441,899 loss resulting from the stolen Navistar checks was reasonably foreseeable to him. He argued that he could not foresee that co-schemers would use his fraudulent documents and mailbox address to perpetrate a fraud involving such a large amount.

The court disagreed. It concluded that through his creation of these many fraudulent documents and mailbox addresses, Arojojoye "set up" a network or "structure" that was "sophisticated[,]" "clearly usable and intended for use for financial fraudulent transactions[,]" and, ultimately, "made it possible" for the transactions (with their resulting losses) "to take place." Because the government introduced a lengthy postal inspec-

tor's report, Arojojoye was again granted a continuance to prepare a rebuttal.

### iii. February 21, 2013, Sentencing Hearing

At the February 12, 2013, sentencing hearing the district court determined that the pecuniary loss exceeded $1 million, and adjusted Arojojoye's offense level accordingly. The district court also addressed additional sentencing guideline enhancements. The parties disagreed over whether Arojojoye was subject to enhancement for conduct as a manager or supervisor pursuant to U.S.S.G. § 3B1.1(b). Regarding this role in the offense enhancement, Arojojoye essentially conceded that he managed or supervised two people—co-defendants Henderson and Kormoi—but argued that for the enhancement to apply, he must have managed at least five people. The district court rejected this interpretation of the guideline, and found that the enhancement applied here where Arojojoye supervised two participants in the course of a scheme which involved five or more participants. A final continuance was granted for the purpose of setting a final hearing on the remainder of the government's proposed sentencing enhancements.

### iv. April 17, 2013, Sentencing Hearing

At the April 17, 2013, sentencing hearing, Arojojoye objected (as he had done previously) to the PSR's four-level increase under U.S.S.G. § 2B1.1(b)(2)(B). That increase was based on a broad definition of "victim" and provided for a four-level increase where the scheme involved at least 50 individuals who had their means of identification used unlawfully and without authority. Over his objection, the

district court included the four-level enhancement in its guidelines calculation.

The district court determined that the total offense level was 29, with a criminal history category of II resulting in an advisory guideline range of 97 to 121 months on Count 20. After acknowledging that Arojojoye utilized the four years he was on pre-trial release "to remain within the bounds of the law and to make significant steps in his own rehabilitation," the district court explained that it chose the sentence it would impose based on the § 3553(a) sentencing factors, rather than on a particular advisory guideline range. The district court then imposed a sentence of 85 months' imprisonment on the bank fraud count (a below-guidelines sentence) and 24 months on the identity theft count, to be served consecutively for a total sentence of 109 months. The remaining counts in the indictment were dismissed on the government's motion. Arojojoye appeals his convictions and sentence.

## II. Analysis

Arojojoye raises five arguments on appeal. First, he argues that the district court erred by accepting his plea to aggravated identity theft (Count 36), because he did not admit to knowing that the identification in question belonged to another actual person. Second, he argues that the district court erred by finding that his conduct involved 50 or more victims (Count 20). Third, he argues that the district court erred in finding that he was a manager or supervisor of criminal conduct. Fourth, he argues that the district court erred in its determination of the the amount of loss attributable to him. Fifth, he argues that

the district court erred in finding that his conduct involved sophisticated means.

### A. *Arojojoyes's Plea of Guilty to Aggravated Identity Theft (Count 36)*

Section 1028A(a)(1) of Title 18 states, in pertinent part, that "[w]hoever, during and in relation to any felony violation … transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Arojojoye first argues that he did not admit to facts sufficient to establish a violation of 18 U.S.C. § 1028A(a)(1); consequently, he argues that the district court erred in accepting his plea to Count 36. Before the district court, Arojojoye did not seek to withdraw his guilty plea or otherwise challenge the sufficiency of the factual basis for that plea. Thus we review for plain error. *United States v. Muratovic*, 719 F.3d 809, 812 (7th Cir. 2013); *United States v. Vonn*, 535 U.S. 55, 59 (2002). Under that standard, Arojojoye "must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Arenal*, 500 F.3d 634, 637 (7th Cir. 2007) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)).

Arojojoye argues that, for a conviction pursuant to 18 U.S.C. § 1028A(a)(1) to be sustained under the Supreme Court's decision in *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009), "the government must prove, or the defendant must admit, that he knew the identification information he was using belonged to another actual person." Appellant Br. 15. He argues further that "the law now 'requires a defendant to

know that he or she has assumed the identity of a 'real person'' and 'not simply a purely fictitious creation not tied to any person.'" *United States v. Aslan*, 644 F.3d 526, 550 (7th Cir. 2011). Appellant Br. 16. The government does not disagree with these rules, it merely disagrees with Arojojoye's application of them to his facts. The government contends that the district court found that Arojojoye knew that a particular identity, "LE," was an actual (and not merely a fictitious) person. Arojojoye argues that the record does not contain evidence providing he knew that "LE" was an "actual person"; consequently, he argues that his guilty plea cannot be sustained.

"Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). At his change of plea hearing, Arojojoye acknowledged to the district court no less than three times—once in direct response to questioning by the court and twice by proffer of his attorney (including once as a proffered recitation of facts supporting guilt)—that "LE" was a real person. First, Arojojoye's attorney stated that Arojojoye "had in his possession … the … date of birth, social security number - - for a lady named Lizel Emborgo." Second, in connection with his plea to Count 36, the district court asked Arojojoye if he illegally "used another person's identification, including social security number, during the commission of bank fraud," to which he responded "Yes, your Honor." Third, during the recitation of facts supporting his change of plea, Arojojoye's attorney stated that "the evidence will show or would show … that on a date before March 28, 2007, [Arojojoye] obtained some identification information for a Lizel … Emborgo … and

… when he was arrested, he had in his possession some of the … vital information, name, social security number, of Lizel Emborgo … ."

Later, at sentencing, Arojojoye twice admitted that he possessed the social security number of Lizel Emborgo. He also admitted to possessing her date of birth and vital information. In light of these admissions, his claim of ignorance of her finite existence is unsustainable. Consequently, it was not erroneous—let alone plainly erroneous—for the district court to accept Arojojoye's guilty plea to Count 36. *Muratovic*, 719 F.3d at 813; *see also United States v. Gomez-Castro*, 605 F.3d 1245, 1248 (11th Cir. 2010) (rejecting defendant's argument that he did not know victim was a "real person" and affirming conviction under § 1028A(a)(1) where defendant purchased a birth certificate and social security card and used these documents to obtain other fraudulent documents).

### B. Arojojoye's Challenge to the Imposition of a Four-level Adjustment for 50 or More Victims Under U.S.S.G. § 2B1.1(b)(2) on Count 20

In the district court, Arojojoye adopted his co-defendant's *Ex Post Facto* Clause challenge to the four-level increase under U.S.S.G. § 2B1.1(b)(2), so his identical challenge is reviewed *de novo. See United States v. Rabiu*, 721 F.3d 467, 470–71 (7th Cir. 2013).

When it imposed Arojojoye's sentence, the district court applied the sentencing guidelines that were in effect on the date Arojojoye was sentenced, not the guidelines that were in effect on the dates he committed his crimes. This practice followed our precedent at that time, *United States v. Demaree*,

459 F.3d 791 (7th Cir. 2006), which held that the *Ex Post Facto* Clause was not implicated when current guidelines yielded a greater advisory guideline range than the guidelines in effect at the time the defendant committed his crimes. *Id.* at 795. After Arojojoye was sentenced and he filed his notice of appeal, the Supreme Court decided *Peugh v. United States,* 133 S.Ct. 2072 (2013), which held that the *Ex Post Facto* Clause of the Constitution is violated when a defendant is sentenced under guidelines in effect after the commission of a criminal act that results in a more punitive guidelines range than would have applied under the guidelines in effect at the time the offense was committed. *Id.* at 2077. ("A retrospective increase in an applicable Guidelines range thus creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation. "). That part of *Peugh's* holding is relevant here, although only preliminarily. In light of *Peugh,* Arojojoye argues that the district court's imposition of a four-level adjustment for 50 or more victims violates the *Ex Post Facto* Clause because it imposed a four-level adjustment based on the guidelines' broader definition of "victim" in effect on the date of Arojojoye's sentencing, rather than the narrower definition of "victim" found in the guidelines in effect at the time of his crimes.

"[T]he government concedes that the evidence did not establish 50 or more victims under the narrower definition of 'victim.'" But Arojojoye's problem is that *Peugh*—and our subsequent precedent interpreting it, *Rabiu*—specifically exempted from *Ex Post Facto* Clause protection situations where "the sentencing court also stated on the record that the identical sentence would have been imposed if the court

followed the older, more lenient version" of the guide-lines—and that is exactly the situation Arojojoye's case presents. *Rabiu,* 721 F.3d at 470; *Peugh,* 133 S.Ct. at 2088 n.8, *see also United States v. Ruelas-Valdovinos,* 2014 U.S. App. LEXIS 6396, *7 (7th Cir., April 7, 2014) (applying *Rabiu* for the same proposition).

Here, the district court stated:

> The sentence that I impose is not necessarily tied in to the Court's finding as to the guideline range. It is, I believe the appropriate sentence in this case re-gardless of whether the guideline range is that being argued by the government or that being argued by the defense.

Thus, "the overstatement of his guidelines range was harmless and his sentence stands." *Rabiu,* 721 F.3d at 471.

### C. *Arojojoye's Challenge to the Imposition of a Three-level Increase for Conduct as a Manager or Supervisor*

Arojojoye also challenges the district court's application of a three-level increase under § 3B1.1(b), which imposes an increase for being a manager or supervisor in a scheme involving more than five participants. Specifically, he contends that he did not manage or supervise any other participant in the charged offense or relevant conduct.[2] Generally, the district court's application of U.S.S.G. § 3B1.1 is reviewed de novo.

---

[2] At sentencing, Arojojoye's attorney conceded that the scheme involved more than five participants. ("I mean, if you want to count the whole scheme, you know, all the defendants named in the case, there are, you know, eight or ten.")

*United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009). And
the district court's "determination concerning a defendant's
role in the offense is a finding of fact, subject to a clearly
erroneous standard of review on appeal." *United States v.
Hankton*, 432 F.3d 779, 793 (7th Cir. 2005). Arojojoye, however,
failed to raise this argument in the district court and therefore
has forfeited it. *United States v. Vasquez,* 673 F.3d 680, 684 (7th
Cir. 2012). We review forfeited arguments for plain error. *Id.* at
684–85.

"A supervisor, a manager, tells people what to do and
determines whether they've done it." *United States v. Figueroa,*
682 F.3d 694, 697 (7th Cir. 2012). Arojojoye argues that the
district court plainly erred in finding that he managed or
supervised "at least two individuals" who were involved in
the scheme. However, at sentencing Arojojoye conceded that
he managed or supervised other participants in the scheme.
Specifically, Arojojoye's attorney stated that Arojojoye
"managed, at best, Mr. Kormoi and Mr. Henderson." And even
if we construe this remark as containing a reservation, i.e., "at
best," Arojojoye admitted in his Plea Declaration that he
recruited and instructed Kormoi to open mail drops in false
names using fraudulent identification that one or the other
provided, and he recruited and directed Henderson to do the
same, as well as to deliver to him fraudulently obtained credit
cards and other items from the mail drops. For their services
rendered, Arojojoye, "gave [Henderson] about $800 for every
batch [] successfully ran through the merchant account,"and
"[Kormoi] was paid for his work by me." Despite this evi-
dence, Arojojoye contends that *United States v. Weaver,* 716 F.3d
439 (7th Cir. 2013), decided after Arojojoye's sentencing,

requires that his sentence be vacated. Like this case, *Weaver* involved the imposition of a three-level increase pursuant to § 3B1.1(b). *Id*. at 441. But in *Weaver*, the defendant simply supplied others with drugs, whereas Arojojoye directed his co-defendants' specific conduct and paid them for it once he determined that they had done it. *See Figueroa*, 682 F.3d at 697. In light of this evidence, the district court did not plainly err in concluding that Arojojoye managed or supervised these two co-defendants who participated in the scheme.

### D. Arojojoye's Challenge to the District Court's Attribution of the $441,899.03 Loss Sustained From the Stolen Navistar Checks

Arojojoye argues that the loss amount attributed to him as the consequence of his fraud was improperly calculated and that as a result of this error his sentence was inflated. The district court's loss findings, including those regarding the scope of jointly undertaken activity and foreseeability, are reviewed for clear error. *See United States v. Wang*, 707 F.3d 911, 914–15 (7th Cir. 2013).

Arojojoye argues that the district court erred in holding him accountable for the scheme involving the cashing of stolen Navistar Leasing Company checks totaling $441,899.03, which he contends was undertaken by co-defendants Ogunsegun, Rabiu, and Adekanbi "when this scheme, its nature, and its scope were not foreseeable to [him]."

Section 1B1.3(a)(1) of the guidelines provides for the loss figure to be based on acts committed by the defendant as well as those a defendant aids and abets, and in the case of "jointly undertaken criminal activity," all "reasonably foreseeable acts

and omissions of others in furtherance of the jointly undertaken criminal activity." In making determinations regarding the scope of jointly undertaken criminal activity, we consider, among other things, defendant's knowledge that numerous others were participating in the scheme, the similarity in method of operation used, length and degree of defendant's participation, and degree of coordination among schemers. *See United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011).

To determine the foreseeability of loss, we start by considering the evidence in context and in cumulation. *United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir. 2000). That's exactly what the district court did at sentencing, when it said:

> As to the amount of loss or as to the reasonable foreseeability of the amount of loss, the number of victims and the proliferation of fraudulent schemes. It's clear to me from this massive evidence here that the defendant was involved on an ongoing basis in helping others conduct fraudulent schemes, some of which he knew details about, some of which he knew only slight information about and some of which he was not knowledgeable about at all; but that the likelihood that his co-schemers were continuing to conduct such schemes and frauds clearly had to be in his mind.

In the words of the district court, the "massive evidence" showed that Arojojoye was the progenitor who created the fraudulent documents and was responsible for the acquisition of the mailbox address used by co-defendants to open the bank account into which the stolen Navistar checks were first

deposited, and he also created fraudulent documents used to open additional accounts into which the stolen funds were thereafter transferred.

Our cases make clear that a "defendant need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *Aslan*, 644 F.3d at 537. Nor is a defendant required to interact personally with his co-schemers in order to be held accountable for their activities. *See Wang*, 707 F.3d at 916. While Arojojoye takes issue with the district court's statement at sentencing that he was being held responsible for "some [conduct] of which he was not knowledgeable at all," this doesn't change the fact that the losses suffered by the victims were foreseeable and attributable to him, so he remains accountable for their losses. As the district court stated when it addressed this argument, this issue "is not even a close call." *See* 11/7/12 Sen. Tr. 30 (rejecting Arojojoye's argument at sentencing that his co-defendants "stole more than I thought they were going to steal."). We agree. The district court did not commit any error—let alone clear error—by holding Arojojoye accountable for the $441,899.03 loss sustained from the stolen Navistar checks. When considered in context and in cumulation this loss was not only reasonably foreseeable—it was inevitable. *Adeniji*, 221 F.3d at 1028. Consequently, the district court did not clearly err in so concluding.

### E. *Arojojoye's Challenge to the District Court's Sophisticated Means Enhancement Imposed Pursuant to U.S.S.G. § 2B1.1(b)(9)(C)*

Finally, Arojojoye contends that the district court erred in applying a two-level sophisticated means enhancement to the

guideline calculation. But in his sentencing memorandum submitted to the district court, he expressly agreed to the PSR's application of the sophisticated means enhancement. He included the two-level enhancement in the guideline calculation he submitted to the court and wrote that the enhancement was "not contested." When the government raised the sophisticated means enhancement at sentencing, his attorney responded, "I don't recall objecting to the sophisticated means." Arojojoye's attorney offered no subsequent argument or objection regarding that enhancement.

As we have acknowledged many times, most recently in *United States v. Tichenor,* 683 F.3d 358 (7th Cir. 2012), "[t]he Supreme Court has distinguished forfeiture as 'the failure to make the timely assertion of a right' and waiver as 'the intentional relinquishment or abandonment of a known right.'" *Id.* at 363 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotations omitted)). "We have found waiver where 'either a defendant or his attorney expressly declined to press a right or to make an objection.'" *United States v. Walton*, 255 F.3d 437, 441 (7th Cir. 2001) (quoting *United States v. Cooper,* 243 F.3d 411, 416 (7th Cir. 2001)). Here, Arojojoye's attorney expressly asserted in his sentencing memorandum that Arojojoye had no objection to the imposition of the sophisticated means enhancement. Thus, Arojojoye waived any objection to the imposition of that enhancement. *See United States v. Richardson*, 238 F.3d 837, 841 (7th Cir. 2001) (holding that a defendant waived an objection to a sentencing enhancement where at sentencing the court asked the defendant's lawyer whether he had an objection to the enhancement and the lawyer said "no").

In his reply brief, Arojojoye suggests that his attorney's remark at sentencing constitutes an objection to this enhancement, and was thus preserved for appellate review. Arojojoye's argument relies completely on the district court's immediate response to his attorney's remark, where the district court stated, "[o]kay. If there is an objection to sophisticated means … [the schemes Arojojoye participated in were] more than sufficient to establish sophisticated means." But here, the district court's efforts to insulate itself from reversal by speaking up and stating a reason for his decision on the record does not turn Arojojoye's attorney's express disclaimer of any objection into an objection.

Even if Arojojoye had only forfeited his objection to the enhancement (and to forestall any ineffective assistance of counsel claim based on our waiver holding), we still would conclude that the district court did not plainly err. *See Vasquez*, 673 F.3d at 684 ("Ultimately, it does not matter whether we find waiver or forfeiture as [defendant's] argument still fails under plain error review."). The creation of fictitious businesses and acquisition of merchant accounts for the sole purpose of defrauding credit card companies fits squarely within the guidelines' definition of "sophisticated." Furthermore, as the district court recognized, this case involved the creation of dozens of false documents and accounts, as well as numerous false business entities, and continued for over three years. The district court's comments, including the comment that Arojojoye "was wrapped up in dozens of different ways in these schemes," indicate that it understood these schemes to be more sophisticated than a typical credit or bank fraud case. *See United States v. Green*, 648 F.3d 569, 577 (7th Cir. 2011)

(upholding sophisticated means enhancement where scheme lasted three years, and involved the creation of false documents, and multiple individuals). The district court acknowledged the extensive scope of this enterprise. Consequently, it was not plain error for the district court to impose the sophisticated means enhancement on Arojojoye's sentence.

## III. Conclusion

It was not plain error for the district court to accept Arojojoye's guilty plea to Count 36. Although it was error to sentence Arojojoye under the guidelines in effect on the date of his sentencing, and not on the dates he committed his crimes, under *Peugh* and our subsequent precedent the error was harmless because the district court clearly stated it would impose the same sentence regardless. The district court's conclusion that Arojojoye managed or supervised two co-defendants was not plainly erroneous. The district court also did not commit clear error by holding Arojojoye accountable for the $441,899.03 loss resulting from the stolen Navistar checks because, when considered in context and in cumulation, this loss was reasonably foreseeable. Finally, Arojojoye waived his right to contest the district court's imposition of the sophisticated means enhancement, and even if he did not, the district court did not commit plain error by imposing it. For these reasons, we AFFIRM Arojojoye's conviction for aggravated identity theft and sentence.